

DIV. "F"

15th JUDICIAL DISTRICT COURT

PARISH OF LAFAYETTE

STATE OF LOUISIANA

DOCKET NO. 2016   0548   F

THE SALVATION ARMY, BARRY J. SALLINGER, and CYPRESS STREET PROPERTIES, LLC

VERSUS

UNION PACIFIC RAILROAD COMPANY, CONSOLIDATED COMPANIES, INC., and SOUTHERN PACIFIC MOTOR TRUCKING COMPANY

FILED: _____        DEPUTY: _____

---

## PETITION FOR DAMAGES

Now into Court, through undersigned counsel, come Plaintiffs, The Salvation Army, Barry J. Sallinger, and Cypress Street Properties, LLC, who respectfully petition this Court for damages, declaratory judgment, and injunctive relief as follows:

### I. Nature of the Case

1. Plaintiffs bring this action to address long known, yet still ignored, environmental damage in the heart of historic downtown Lafayette that has impacted and is threatening to further impact Lafayette's drinking water supply, the Chicot Aquifer. Defendants are legally and morally responsible for this damage.

2. Despite an Environmental Impact Statement, two prior lawsuits, piecemeal testing, and decades of environmental regulatory agency "oversight," no meaningful action has been ordered, much less taken, to require a comprehensive assessment of the environmental impact at the approximately 40 acre former Southern Pacific Railroad/Union Pacific Railroad Lafayette rail yard operations area ("Facility").

3. Soil and shallow groundwater testing on file with the Louisiana Department of Environmental Quality ("LDEQ") confirms the presence of a toxic stew of "Superfund" hazardous substances perilously perched atop the Chicot Aquifer. Yet diligent review of

Page 1 of 17

STAMPED COPY GIVEN





available LDEQ records reveals that no testing in the Chicot has ever been ordered or performed.

4. Documented contamination at the Facility constitutes an illegal, imminent, and substantial endangerment to Plaintiffs' and the entire Lafayette community's health and safety.

5. Comprehensive site-wide assessment of the Facility is necessary to design a meaningful contaminant cleanup of the Facility and adjacent areas—to eliminate the threat it poses to the Chicot, to prevent further contaminant migration, and to protect the entire Lafayette community.

6. Plaintiffs challenge Defendants to come forward in response to this Petition and meet with Plaintiffs' attorneys and experts and LDEQ to promptly:

    A. Accept responsibility for this environmental damage;

    B. Develop and adopt a mutually agreeable comprehensive assessment plan that will identify and characterize all contaminants throughout the entire Facility;

    C. Define the horizontal and vertical extent of that contamination both on and off site; and

    D. Adopt a timeline to properly and expeditiously clean up Defendants' toxic legacy to the Lafayette community.

### II. The Plaintiffs

7. Plaintiffs are:

    A. Salvation Army, a non-profit foreign corporation that owns two separate tracts of land, municipal addresses 115 East 3rd Street and 212 6th Street, Lafayette, Louisiana;

    B. Barry J. Sallinger, a person of full age of majority, who owns a tract of land, municipal address 223 Garfield Street, Lafayette, Louisiana, and who is a citizen of Louisiana;

      C. Cypress Street Properties, LLC, a Louisiana limited liability company that owns a tract of land, municipal address 124 East Cypress Street, Lafayette, Louisiana, and whose members are citizens of Louisiana.

8. Plaintiffs are all owners of immovable property on or in the area adjacent to and surrounding the Facility, whose property rights and corresponding right to peaceful possession have been damaged and infringed upon by Defendants.

9. Plaintiffs first learned of the possibility of contamination and the factual basis supporting the claims made herein less than two months before the date of the filing of this Petition after meeting with counsel and being advised for the first time of the possibility of the complained environmental damage.

10. In the past and to this very day, Defendants actively concealed and intentionally failed to disclose evidence of the contamination despite clear knowledge of it and its dangers to Plaintiffs and the Lafayette community.

11. The Plaintiffs bring this action solely under the laws of the State of Louisiana and do not seek to recover any claim that has been discharged in bankruptcy.

12. The Plaintiffs seek to recover all other general and equitable relief to which they are entitled under state law, including but not limited to, mandatory injunction supported by strict liability, negligence, nuisance, trespass, violation of state environmental regulatory laws, and punitive damages. Plaintiffs seek a declaratory judgment finding the Defendants liable for the contamination and the remediation of the Facility and the property owned by the Plaintiffs. The Plaintiffs also seek to recover evaluation, remediation, attorneys' fees and costs pursuant to the Louisiana Groundwater Act, La. R.S. 30:2015, *et seq*.

### III. Defendants

13. Defendants are:

      A. **Union Pacific Railroad Company** ("Union Pacific"), a foreign corporation authorized to do and doing business in Louisiana. Union Pacific is the successor-in-interest to Southern Pacific Transportation Company and Southern Pacific Railroad Company;

Page 3 of 17

    B. **Consolidated Companies, Inc.** ("Conco"), a Louisiana corporation; and

    C. **Southern Pacific Motor Trucking Company** ("Southern Pacific"), a foreign corporation authorized to do and doing business in Louisiana. Southern Pacific is successor-in-interest to Pacific Motor Trucking Company and is a wholly owned subsidiary of Union Pacific Railroad Company.

14. Defendants owned, leased, and operated on the property described below and created and contributed to a commingled plume of contamination that is damaging, has damaged, and otherwise adversely impacts the property interests of the Plaintiffs, and that is threatening the City of Lafayette's drinking water source, the Chicot Aquifer.

### IV. Jurisdiction and Venue

15. Venue is proper in Lafayette Parish pursuant to Articles 74 and 80 of the Louisiana Code of Civil Procedure, because the wrongful conduct complained of occurred in Lafayette Parish. The properties of which certain rights are at issue are also located in Lafayette Parish.

16. The amount in controversy is sufficient to justify the jurisdiction of the Fifteenth Judicial District Court for Lafayette Parish.

### V. Exhibits to Petition

17. Attached to and made part of this Petition are the following Exhibits, which support the Plaintiffs' claims and assertions:

| | |
|---|---|
| **Exhibit A:** | C.H. Fenstermaker and Associates (1991). *Phase I Environmental Site Assessment Report*, Chestnut Street Site, Lafayette, LA |
| **Exhibit B:** | Hydro-Environmental Technologies ("HET") (1991). *Phase II Site Investigation Report*, Chestnut Street Site, Lafayette, LA |
| **Exhibit C:** | HET (1992). *Phase III Site Investigation Report*, Chestnut Street Site, Lafayette, LA |
| **Exhibit D:** | HET (1992) *Supplemental Data for Contamination Assessment Report*, Conco Food Distributors Facility, 1016 Southwest Evangeline Thruway, Lafayette, LA |
| **Exhibit E:** | Stewart L. Stover, Jr. (2005). *Affidavit of Stewart Stover, Consolidated Companies, Inc. v. Union Pacific Railroad Company, et al.*, USDC WDLA, suit no. 98-1804 |

Page 4 of 17

**Exhibit F:**   Sigma Environmental, Inc. (2007). *Soil and Groundwater Investigation Work Plan Former Railroad Facility,* Lafayette, LA

**Exhibit G:**   February 1, 2016, Report of Paul H. Templet, Ph.D.

### VI. Factual Basis for Claims

18. Plaintiffs are owners of immovable property situated within Lafayette, Louisiana, located on and/or adjacent to and surrounding the Facility.

#### A. Facility History

19. The Facility consists of the former Southern Pacific Company and Southern Pacific Transportation Company's massive railroad yard, where operations began in the early 1900s. Those operational activities included fueling, watering, overhaul, maintenance, and associated practices involving, *inter alia*, its railroad engines and cars.

20. The Facility also consists of the former Conco Food Distributors site, which had an underground storage system for storage of diesel, and which was the object of an LDEQ enforcement action but which has never been properly cleaned up. This property was owned by Conco during Plaintiffs' ownership of their property until, upon information and belief, Conco sold its property as a part of a secret and illegal "under seal" settlement of lawsuits against Defendant Union Pacific pending during the years 2003-2011.

21. The Facility is geographically located within the City of Lafayette and bordered roughly by Simco Street to the north, Evangeline Throughway to the east, the existing railroad right-of-way to the west, and Taft Street to the south.

22. Around the early 1960s, Southern Pacific, the predecessor-in-interest to Defendant Union Pacific, subdivided and sold off certain parcels of the Facility to other entities. These parcels were divided as follows:

    A.  The Conco site located at 1016 Southwest Evangeline Thruway;

    B.  The Georgia Pacific site located at 814 Southwest Evangeline Thruway;

    C.  The PMT site located at 810 Southwest Evangeline Thruway;

    D.  The P.J.A. Properties, Inc., site at 600-602 Southwest Evangeline Thruway; and

E. The Chestnut Street site/Johnston Street site located across Johnston Street at its intersection with the Southwest Evangeline Thruway.

23. However, all of these "sites" are contiguous parcels of property that comprise the single Facility and contamination source for purposes of this Petition and of the threat to the Lafayette drinking water supply.

24. At various times throughout the operations at the Facility, the equipment and works at the Facility consisted of at least the following: a 35,000 barrel above ground fuel oil tank once located on the Conco site; a 30,000 barrel above ground fuel oil tank once located on the Georgia-Pacific site; a machine shop and a roundhouse once located on the PMT and P.J.A. sites; multiple paint houses; multiple oil houses; multiple shops where repairs were performed and where oil, fuel, and dynamite were stored; and thousands of feet of railroad track. In addition, numerous pipelines, wells, and drains traversed the Facility during its active use as a rail yard. At least two large fresh-water industrial wells were also located at the Facility, and Conco had a diesel underground storage tank system at the Facility.

### B. Toxic Legacy of the Facility

25. As early as 1991, all Defendants were aware of the presence of hazardous wastes and/or hazardous substances at, on, or under the Facility and in the groundwater below, as well as the specific activities that sourced the contamination found there today, including, but not limited to, spillage, disposal, and other imprudent operations.

26. Since 1991, soil and shallow groundwater testing on file with the Louisiana Department of Environmental Quality ("LDEQ") confirms the likely presence of a toxic stew of "Superfund" hazardous substances perched atop the Chicot Aquifer. Yet, diligent review of available LDEQ records reveals that no testing in the Chicot Aquifer has ever been ordered by LDEQ, much less performed by any Defendant.

27. In fact, Defendants presented soil and groundwater information to the Louisiana Department of Environmental Quality ("LDEQ"), which, because it was not considered in conjunction with the entirety of the Facility, did not allow the LDEQ to fairly and adequately protect the Plaintiffs and the Chicot Aquifer.

28. Defendants have confirmed the presence of Phase Separated Hydrocarbons ("PSH") in groundwater beneath the Facility but have failed to implement any protective or remedial measures to prevent the PSH and related toxic pollutants from leaching into and migrating to the Chicot Aquifer and the properties of Plaintiffs.

29. Because of the probability of and likely downward migration of these pollutants, contaminants, toxic wastes, and constituents into the Chicot Aquifer, a usable water supply is at least threatened by the contamination, if not already contaminated.

30. The Chicot Aquifer below the Facility is the City of Lafayette's water supply. In fact, Lafayette's North Water Plant water supply well #16 is located a couple of hundred feet north of the Facility. The Chicot Aquifer begins at a depth of approximately 37 feet below ground surface in the area of the Facility.

31. The actual direction of groundwater flow beneath the Facility is difficult to determine because of the lack of a comprehensive universal monitoring system on the entire Facility, but it has been documented as moving in virtually all directions at one time or another from discrete areas within the Facility.

32. The Defendants have failed to address issues relating to the exact location and condition of the aforementioned fresh-water industrial supply wells. Any failure to properly plug and abandon these wells creates a direct conduit for contaminants to migrate downward into the Chicot Aquifer. The presence of these wells presents a continuing threat to the health, safety, and welfare of the Plaintiffs.

33. Conduits for migration also exist immediately adjacent to the Facility and include a storm drain, municipal sewer lines, water lines and natural gas lines running alongside or underneath the Southwest Evangeline Thruway. No one has yet performed a comprehensive investigation of the Facility and surrounding offsite areas for other possible conduits.

34. The continuing presence of hazardous substances, toxic wastes, contaminants, and pollutants in the groundwater and subsurface of the Facility is and/or may be migrating offsite to the soils and groundwater beneath the Plaintiffs' properties.

Page 7 of 17

35. The continuing presence of hazardous substances, toxic wastes, contaminants, and pollutants is likely impacting the usable groundwater of the Chicot Aquifer, drinking water source for all of Lafayette, Louisiana.   At a minimum, these hazardous substances, toxic wastes, contaminants, and pollutants are threatening the usable groundwater of the Chicot Aquifer.

36. The documented and historical contamination at the Facility constitutes an illegal, imminent, and substantial endangerment to the health and environment of Plaintiffs and the Lafayette community.

### C. A History of No Action

37. Despite knowing that PSH and other contaminants are present in the groundwater that flows in the direction of the properties of Plaintiffs, the Defendants walked away and left the PSH and other contamination problems to worsen, insuring that no comprehensive evaluation and remediation would or could occur.

38. A comprehensive, universal investigation of the contamination at and below the Facility has never taken place, and the horizontal and vertical extent of contamination has neither been investigated nor defined by any of the Defendants.

39. Some pollution source areas at the Facility have never been sampled or investigated at all.

40. Remarkably, in spite of Defendants' knowledge of contamination and potential harm, there has never been any testing of the Chicot Aquifer at or adjacent to the Facility.

41. A universal monitoring system across the entire Facility, as well as a comprehensive assessment, is needed because there may be bends or other unknown or non-natural conduits that could affect the direction of groundwater flow.  For example, the Vermilion River could alter the groundwater flow.  In addition, the construction of the planned Interstate Highway 49 connector is a potential disrupter of groundwater flow and would likely create a vertical conduit into the Chicot Aquifer.

42. Further, the Defendants advocated for the LDEQ to issue, pursuant to the Risk Evaluation Corrective Action Program ("RECAP"), a "No Further Action at This Time"

("NFA letter") letter for each of the sites that comprise the Facility. LDEQ did issue the NFA letters.

43. The RECAP program is a risk-based decision method that LDEQ uses to determine which sites to close. Site closure does not equate to a complete removal of contamination or pollution or its environmental threat.

44. In this case, LDEQ utilized industrial RECAP standards to issue the NFA letters. Industrial standards, both screening and remedial, are less protective than residential because LDEQ has determined that the risk to human health is lower on an industrial site than on a residential site. However, here, the Facility is a neighbor and adjacent to many residences. Furthermore, at a minimum, the presence of the abandoned water wells through the Facility contamination provides a residential exposure pathway that cannot be supported by an industrial closure standard option.

45. The issuance of an NFA letter does not mean that a site is clean and no longer a threat to the usable groundwater of the Chicot Aquifer, to offsite migration, or to human health and the environment.

46. All Defendants in their past dealings confirmed that the Facility has toxic constituents or contaminants still present in the soil and groundwater.

**D. Site Action Required**

47. A comprehensive evaluation is indispensable to adequately protect the health and environment of Plaintiffs and the Lafayette Community.

48. Comprehensive assessment of the Facility is necessary to design a meaningful cleanup of the Facility and adjacent areas impacted by the contamination, to eliminate the threat such contamination poses to the Chicot Aquifer, to prevent further migration and spreading of the environmental damage, and to protect the property rights of Plaintiffs.

49. Defendants have known or should have known of the continuing presence of hazardous substances, toxic wastes, pollutants, and contaminants at the Facility; nevertheless, Defendants have intentionally and negligently, with brazen disregard

of the Lafayette Community, failed to fully and completely evaluate and remediate the contamination they caused.

50. Defendants have failed to warn the Plaintiffs of the risks associated with the Defendants' acts and omissions.

51. Thus, the actions and inactions of Defendants have caused the loss and damage that has or will be incurred by Plaintiffs, including expenses and costs for investigation, evaluation, and remediation of the Facility and the properties owned by Plaintiffs.

### VII. Causes of Action

52. Plaintiffs adopt, repeat, and re-allege the factual allegations set forth above as if copied *in extenso* with each cause of action listed below.

### A. Louisiana Civil Code Articles 667-669 Liability

53. Defendants are proprietors of neighboring estates under La. Civ. Code art. 667-669. Defendants have a predial servitude, real right obligation to Plaintiffs pursuant to La. Civ. Code art. 667. This is an obligation owed from one estate to not damage or restrict or impair the property rights of its neighbor, including the right to peaceful possession and unrestricted use and enjoyment.

54. Thus, as owners of neighboring estates, Defendants are strictly liable for the damage and continuing, damaging nuisance to neighboring estates, including Plaintiffs' lands affected by the discharge, disposal, and storage of hazardous and toxic substances thereon and/or adjacent to Plaintiffs' property.

55. Moreover, Defendants knew, know, and should have known that the contaminants present at and below the Facility may and has migrated offsite through and under the property of the Plaintiffs, thereby causing damage and loss.

56. Defendants have utilized the Facility in a manner and means that has deprived the Plaintiffs of the full use and enjoyment of their property.

57. Plaintiffs are entitled to damages and injunctive relief for the evaluation and remediation of the contamination nuisance at and under the Facility that is likely

migrating offsite and contaminating the usable groundwater of the Chicot Aquifer, as well as any damage to the Property owned by Plaintiffs.

### B. Louisiana Civil Code Article 2315 Negligence

58. Defendants knew or should have known that their operations caused and contributed to the contamination at and under the Facility.

59. Plaintiffs never gave permission to Defendants to put and store their toxic wastes and pollution on Plaintiffs' lands.

60. Defendants had a duty to protect the Plaintiffs from the harmful effects of their operations. Defendants have violated regulatory standards and statutory obligations constituting a duty to Plaintiffs, and the breach of which gives rise to tort liability.

61. Defendants have failed to take any meaningful action to prevent and eliminate the contamination damage.

62. Defendants negligently and/or intentionally failed to warn Plaintiffs of the dangerous conditions present at and under the Facility. Defendants failed to warn that the contamination at and under the Facility has and will seep and migrate in the subsurface.

63. Defendants' actions and inactions violated the legal duty owed to Plaintiffs.

64. Defendants' violation of this duty proximately caused the harm to Plaintiffs.

65. Plaintiffs are entitled to damages for the evaluation and remediation of the contamination at and under the Facility that is likely migrating offsite and contaminating the usable groundwater of the Chicot Aquifer, as well as any damage to the Property owned by Plaintiffs.

### C. Louisiana Civil Code Article 2315 Trespass

66. The presence of these toxic and hazardous substances on the lands of the Plaintiffs constitutes a trespass. Moreover, as long as the migration of these substances from Defendants' lands onto Plaintiffs' is not abated, additional contaminants move onto Plaintiffs' property each day. Thus, until the contaminants on Defendants' lands are removed, the trespass will continue.

http://clerkconnect.lpclerk.com/ImageViewer/PrintImage.aspx                3/14/2016

### D. Louisiana Civil Code Article 2315.3 Punitive Damages

67. Defendants had possession and control of the Facility and the toxic substances during the time period in which Article 2315.3 was effective and are liable for punitive and exemplary damages for their actions and inactions occurring during this time period.

68. The contamination and the failure to evaluate and remediate the contamination resulted from the Defendants' gross negligence and reckless disregard for public safety in the handling, transportation, and handling of the toxic substances.

69. The Defendants' wanton and reckless misconduct includes the following:

    A. Failing to properly inspect and monitor the aquifer, groundwater, and soils under and around the Facility to insure that the contaminants had not migrated into the soils, groundwater, and usable groundwater on and beneath the property owned by the Plaintiffs;

    B. Failing to comply with the law in the conduct of their operations and post-operation actions, as well as failing to use reasonable measures to insure that no leaks, spills, or releases of the contaminants would migrate into the aquifer, groundwater, and soils;

    C. Failing to contain leaks, spills, releases of the contaminants;

    D. Improperly disposing of the contaminants; and

    E. Other acts and/or omissions that will be proven at the trial of this matter.

70. The above-described activities and omissions occurred during the time period in which Article 2315.3 was effective.

71. Accordingly, the Plaintiffs are entitled to an award of punitive damages from the Defendants pursuant to Article 2315.3.

### E. Louisiana Civil Code Articles 2317 and 2322 Strict Liability

72. The damaging facilities, equipment, and works on the Facility were owned and/or operated by Defendants and in their custody and control at all relevant times within the meaning of La. Civ. Code arts. 2317 and 2322.

73. At all times pertinent hereto, Defendants had *garde* of the facilities and equipment and works that caused the damage and pollution described herein, because Defendants owned and utilized the defective pollution-causing facilities, equipment, and works at the Facility and therefore had sufficient control to constitute *garde* under the provisions of La. Civ. Code arts. 2317 and 2322.

74. The defective pollution-causing facilities, equipment, and works at the Facility at all pertinent times hereto present an unreasonable risk of harm to Plaintiffs.

75. Defendants are strictly liable for the damage caused by the facilities, equipment, and works of which they had *garde*.

76. Plaintiffs are entitled to damages consisting of a complete evaluation and remediation of the toxic waste and contaminants resulting from the equipment, facilities, and works of which the Defendants had *garde*.

**F. Louisiana Civil Code Articles 2317, 2317.1, and 2322 Liability**

77. The damaging facilities, equipment, and works at the Facility are/were owned and/or utilized by Defendants.

78. The damaging tanks and other facilities, equipment, and works at the Facility are/were things and/or buildings under the custody and control of Defendants within the meaning La. Civ. Code arts. 2317, 2317.1, and 2322.

79. The contamination originating from the Facility constitutes a vice or defect and presents an unreasonable risk of harm to the Plaintiffs, as set forth in La. Civ. Code arts. 2317 and 2317.1.

80. The Defendants had/have possession and control of the Facility and the toxic substances that have migrated or will migrate offsite in the future.

81. Defendants knew or should have known of the defects in the facilities, equipment, and works at the Facility that caused the damaging contamination.

82. Despite this knowledge, Defendants failed to conduct a reasonable inspection of their facilities, equipment, and works at the Facility by failing to completely evaluate and remediate the contamination present on and beneath the Facility that threatens and/or

Page 13 of 17

impacts the property of Plaintiffs, as well as the usable groundwater of the Chicot Aquifer.

83. Thus, Defendants failed to exercise reasonable care to prevent the above-described damaging contamination.

84. Plaintiffs are entitled to damages consisting of a complete evaluation and remediation of the toxic waste and contaminants resulting from the equipment, facilities, and works of Defendants.

### G. Louisiana Groundwater Act Liability

85. Defendants' prior assessment activities demonstrated that the contaminants present at the Facility migrate through pathways to shallow groundwater that poses a real threat to and/or has impacted the usable groundwater of the Chicot Aquifer.

86. The Defendants' actions and omissions contributed to the threat and/or impact to the usable groundwater of the Chicot Aquifer.

87. Under La. R.S. 30:2015.1, the Groundwater Act, the party responsible for threatening or contaminating usable groundwater must pay for evaluation and remediation of any contamination that threatens or impacts the usable groundwater.

88. As the responsible parties for the contamination that threatens and/or impacts the usable groundwater of the Chicot Aquifer, the Defendants are strictly liable for the evaluation and remediation of the contamination.

### H. Louisiana Civil Code Article 2298 Unjust Enrichment

89. Defendants have unjustly enriched themselves to the detriment of Plaintiffs by not paying the costs of complete evaluation and remediation of the contaminated soil and groundwater on, under, and adjacent to the Facility.

90. To the extent Plaintiffs have no other remedy at law to repair the damage caused by Defendants, Plaintiffs are entitled to share in the profits reaped by Defendants as a result of their failure to evaluate and remediate the contamination of soil and groundwater on, under, and adjacent to the Facility.

**VIII. Jury Demand**

91. The Plaintiffs are entitled to and request a jury trial.  Plaintiffs' claims for damages exceed $50,000.

**IX. Prayer for Relief**

90. Wherefore, the Plaintiffs pray that Defendants be served with a citation and copy of this Petition, and after all legal delays have passed, that judgment be entered in favor of the Plaintiffs as pled herein:

1. For judgment awarding Plaintiffs compensatory damages in an amount to be determined at trial, including payment of damages equal to the cost of a full comprehensive assessment of their properties and the contamination source properties and to restore Plaintiffs polluted lands to their original, unpolluted state and/or prevent them from becoming contaminated;

2. For judgment awarding Plaintiffs private damages for diminution in value, loss of full use and enjoyment, loss of peaceful possession, and for stigma;

3. For judgment awarding Plaintiffs punitive damages;

4. For judgment finding that Defendants are responsible for the threat and/or impact to usable groundwater pursuant to La. R.S. 30:2015.1;

5. For development of an evaluation and remediation plan pursuant to La. R.S. 30:2015.1;

6. For payment into the registry of the Court for costs necessary for evaluation and remediation of usable groundwater pursuant to La. R.S. 30:2015.1;

7. For Attorneys Fees and Costs pursuant to La. R.S. 30:2015.1;

8. For Declaratory Judgment finding Defendants responsible for the contamination and the evaluation and remediation of the contamination that threatens or has impacted the usable groundwater of the Chicot Aquifer and threatens and/or impacts Plaintiffs' land;

9. For judgment ordering a mandatory and prohibitory injunction pursuant to La.Code Civ.P. art. 3601 to stop any Defendants' actions which are contaminating and/or threatening to contaminate Plaintiffs' properties and the

Page 15 of 17

Chicot Aquifer, and further to require evaluation and remediation of the contamination threatening or impacting the Chicot Aquifer and/or properties owned by Plaintiffs; and

10. All other general and equitable or further relief that the Court may deem just and proper. Notwithstanding anything to the contrary herein, Plaintiffs make no claims that are discharged in bankruptcy.

Respectfully submitted the 1st day of February, 2016,

William W. Goodell, Jr. (#6129)
The Goodell Law Firm
Post Office Box 52663
Lafayette, Louisiana 70505
T: 337.412.2724
E: bill@goodelllaw.com

Elizabeth A. Roché (#31304)
Korey A. Nelson (#30002)
Burns Charest LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
T: 504.799.2845
F: 504.881.1765
E: eroche@burnscharest.com
   knelson@burnscharest.com

Gordon Schoeffler
Post Office Box 4829
Lafayette, Louisiana 70502
T: 337.232.8123
F: 337.235.5629
E: gschoeffler@josephjoy.com

Joseph R. Joy, III
Post Office Box 4929
Lafayette, Louisiana 70502
E: buzzyjoy@josephyjoy.com

**Please Serve:**

**Consolidated Companies, Inc.**
**through its registered agent**
**Winslow J. Chadwick, Jr.**
**1 Galleria Blvd., Suite 1512**
**Metairie, Louisiana 70001**

FILED THIS
DAY OF _____ Feb _____ , 20 16

_____
Deputy Clerk of Court

Page 16 of 17

Southern Pacific Motor Trucking Company
through its registered agent
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

Union Pacific Railroad Company
through its registered agent
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

Page 17 of 17



RECEIVED BY

AUG 1 3 1993

GROUND WATER
PROTECTION DIVISION

# PHASE I

# ENVIRONMENTAL SITE ASSESSMENT

## FOR

### THE CITY OF LAFAYETTE
### P.O. BOX 4017-C
### LAFAYETTE, LOUISIANA  70502

## OCTOBER 1991

Prepared By:

FILED THIS
DAY OF _____ , 2016
Deputy Clerk of Court

## C. H. FENSTERMAKER & ASSOCIATES, INC.

A PROFESSIONAL CORPORATION

| | | |
|---|---|---|
| Civil Engineers | Lafayette Office | New Orleans Office |
| Land Surveyors | 135 Regency Square | Energy Center, Suite 1550 |
| Environmental Consultants | P.O. Box 52106, OCS | P.O. Drawer 57089 |
| | Lafayette, LA 70505 | New Orleans, LA 70157-7098 |

(318) 237-2200
(318) 232-3299 FAX

(504) 582-2201
(504) 582-2210 FAX

EXHIBIT
A

ClerkConnect Document Viewer                                      Page 2 of 200

 

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| DISCUSSION ON FINDINGS | . . . . . . . . . . . . . . . . . . . . . | 5 |
| Site Description & Characterization | . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| Soil Description & Groundwater Information | . . . . . . . . . . . . . . . . . . | 6 |
| Land Report | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| Data Search & Regulatory Review | . . . . . . . . . . . . . . . . . . . . . | 10 |
| Site Inspection & Interviews | . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| CONCLUSION | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |

## LIST OF FIGURES

| FIGURE 1 - SITE PLAN | . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
|---|---|---|
| FIGURE 1-A - SITE PLAN (Showing UST | . . . . . . . . . . . . . . . . . . . . | 4 |
| FIGURE 2 - INFRARED PHOTO | . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |

## APPENDICES

APPENDIX A - Sanborn Fire Insurance Maps

APPENDIX B - Site Photos

APPENDIX C - Right-of-Entry Permit

ClerkConnect Document Viewer

# INTRODUCTION

A Phase I Environmental Site Assessment has been performed by C.H. Fenstermaker & Associates, Inc. ("FENSTERMAKER") for the City of Lafayette ("CLIENT") on property of Southern Pacific Transportation Company. The property is identified as Tract "B", shown herein on the Plat presented as Figure 1. A Right-of-Entry Permit for an Environmental Assessment was granted by Southern Pacific Transportation Company (SPTC) to the City of Lafayette to permit entry onto the described property. The Right-of-Entry Permit is presented in Appendix C. This assessment was conducted in accordance with the terms and conditions of the Permit and was accomplished through review of each of the following sources of information concerning the previous ownership and uses of the property:

A.   Review of the Conveyance and Mortgage records of Lafayette Parish and records of the Louisiana Department of Natural Resources - Office of Conservation for the purpose of determining historical usage of land.

B.   Investigation of any readily accessible and reasonably pertinent local, State and Federal government records, regulatory agencies, investigative reports and other environmental records which report incidents, activities and/or contributions which are likely to cause or contribute to a release or threatened release of hazardous substances on the property.

C.   Infrared aerial photograph obtained from the United States Fish & Wildlife Service.

D.   A visual site inspection of the property and obvious structures situated on the property and a visual inspection of immediately adjacent properties from the real property including an investigation of chemical use, storage, treatment and disposal practices on the property.

E.   Interviews with Southern Pacific Transportation Company personnel and persons familiar with historical aspects of the site.

FENSTERMAKER has advised CLIENT that other potential sources of information concerning the history and use of the site may exist, but that the above described sources, are representative of the types of sources which would be reasonably expected to provide readily ascertainable information concerning site history and usage. CLIENT has agreed to provide to FENSTERMAKER any other sources of information known to CLIENT concerning the history and usage of the site and surrounding area.

CLIENT has been specifically advised that environmental geologic, geotechnical and geohydrologic conditions may often vary from time to time at the site where the site assessment has been conducted and that due to this and other factors, the limited data results in uncertainty with respect to the interpretation of the conditions observed at the site, despite due professional care. CLIENT has been advised and recognizes that the purpose of this Phase I Site Assessment is not to actually determine whether pollutants, contaminants, wastes, hazardous materials, or other substances are in fact present at, on, beneath or near the site in question. The purpose of this Phase I Site

-1-

Assessment is to provide the CLIENT with information gathered from the sources detailed above to assist the CLIENT in deciding whether or not a Phase II Assessment of the site should be conducted. A Phase II Assessment would have as its purpose the determination of whether or not such substances likely are present at, on, beneath or near the site. FENSTERMAKER represents that this Phase I Site Assessment has been conducted with due care, but makes no other warranty or guarantee, expressed or implied, concerning the conclusions reached with regard to the site in question.

The information and conclusions presented herein are considered to be proprietary to the CLIENT, and will be disclosed by FENSTERMAKER only to the CLIENT unless CLIENT specifically and in writing directs FENSTERMAKER to disclose same to any other party. Such disclosure, however, shall create no rights on the part of any party whatsoever. This document is not intended to and does not allow any person to rely upon its conclusions as a certification of the presence or absence of any pollutants, contaminants, wastes, hazardous materials or other substances at, on, beneath or near the site.

-2-

# FIGURE 1

## _SITE PLAN_

-3-



TRACT "B"

SOUTHERN PACIFIC TRANSPORTATION COMPANY

5.3074 ACRES GROSS - 231,192.14 Sq. Ft. GROSS
5.1061 ACRES NET  - 222,422.68 Sq. Ft. NET

FIGURE 1

SITE PLAN

Property of

Southern Pacific Transportation Company

Section 67, T9S-R4E

Lafayette Parish, Louisiana



# FIGURE 1-A

## *SITE PLAN*

*(Showing UST)*

-1-



## DISCUSSION ON FINDINGS

### SITE DESCRIPTION & CHARACTERIZATION

The site is located in Section 67, Township 9 South - Range 4 East, Lafayette Parish, Louisiana. The site encompasses approximately 5.1061 acres net of relatively flat terrain. The majority of the site is presently unpaved. Some shelled areas were readily observed throughout the site. A layer of native grasses and weeds cover the greater portion of the site. One 36" Oak Tree was noted as shown in Figure 1. One tin-walled building with an earthen floor is located on the property along Chestnut Street. This building was reported being used as a Blacksmith Shop. A concrete slab was also noted near the Blacksmith Shop. Details on the Blacksmith Shop and concrete slab are presented in the Site Inspection section of this report.

Given the existing topography as determined through observation, it appears that surface water runoff is in a direction away from the existing railroad tracks. It is assumed that most of the runoff is eventually collected and carried away by the City's municipal stormwater system.

-5-

## SOIL DESCRIPTION AND GROUNDWATER INFORMATION

As presented in the Soil Survey of Lafayette Parish, Louisiana, published by the United States Department of Agriculture - Soil Conservation Service, soils within the property boundaries are described primarily as a Coteau Silt Loam on the southerly 2/3 of the property and a Memphis Silt Loam on the Northerly 1/3 portion.

As found in a representative Coteau Silt Loam, the surface layer is medium acid, dark brown silt loam about 8 inches thick. The subsoil to a depth of 16 inches is strongly acid, dark brown silt loam. To a depth of 26 inches, it is strongly acid, dark yellowish brown silty clay loam mottled with gray; to a depth of 57 inches, it is medium acid, dark yellowish brown silt loam mottled with light brownish gray; and to a depth of 60 inches or more, is slightly acid, dark brown silt loam that has gray mottles.

Typically, as found in a Memphis Silt Loam, the surface layer is medium acid, dark grayish brown silt loam about 8 inches thick. The subsoil to a depth of 18 inches is very strongly acid, dark yellowish brown silty clay loam. To a depth of 32 inches, it is strongly acid, dark brown silty clay loam, and to a depth of 53 inches, it is medium acid, dark brown silt loam. The underlying material, to a depth of 82 inches or more, is slightly acid, dark brown silt loam. The seasonal high water table is at a depth of more than 6 feet.

In discussion with Southern Pacific Transportation Company personnel the majority of this site when originally developed could possibly have been covered with approximately eight (8) inches of limestone.

The underground sources of freshwater throughout the parish yield large quantities of hard water. Wells range in depth from 200 feet to more than 700 feet while water levels range in depth from 20 to 70 feet.

-6-

## LAND REPORT

A review dated September 13, 1991, by C. H. Fenstermaker & Associates, Inc., of the Conveyance and Mortgage records of Lafayette Parish, Louisiana was developed from the years of July 23, 1881 to September 13, 1991. The emphasis of this review was placed on determining usage of the subject property.   Finally, a review of the Louisiana Department of Natural Resources - Office Of Conservation (Lafayette District) was performed to determine if there were any records of wells drilled or permitted on these lands.

It should be noted that the work performed above is limited, in that it is a "BEST EFFORTS" based on the evaluation of only the conveyance and mortgage records and NOT the suits, chattels, etc., records of Lafayette Parish, Louisiana nor is the evaluation of the records of the Louisiana Department of Natural Resources - Office of Conservation complete, in that there are additional records which could be reviewed in the Lafayette District and in Baton Rouge, Louisiana.

SURFACE OWNERSHIP:   Southern Pacific Transportation Company

MORTGAGE:

A.   Indenture Agreement dated 1/1/1879, recorded in COB R, Folio 139, Entry No. 9413, Lafayette Parish, Louisiana to Central Trust Company.

B.   First Mortgage Bond Issuance dated 2/25/1887, recorded in COB A-2, Folio 202, Entry No. 15549, Lafayette Parish, Louisiana to Central Trust Company.

C.   Indenture dated 6/13/1934, recorded in COB A-11, Folio 246, Entry No. 109741, Lafayette Parish, Louisiana to Texas and New Orleans Railroad Company.

D.   First and Refunding Mortgage dated 1/1/1938, recorded in SPB-1, Folio 473, Entry No. 133526, Lafayette Parish, Louisiana to Chemical Bank & Trust Company, Trustee.

E.   First Supplemental Indenture dated 4/1/1946, recorded in SPM-2, Folio 251, Entry No. 191473, Lafayette Parish, Louisiana to Chemical Bank & Trust Company, Trustee.

F.   Second Supplemental Indenture dated 11/1/1961, recorded in COB X-35, Folio 391, Entry No. 417003, Lafayette Parish, Louisiana to Chemical Bank New York Trust Company.

G.   Third Supplemental Indenture dated 11/26/1969, recorded in Entry No. 552934, Lafayette Parish, Louisiana to Chemical Bank New York Trust Company.

-7-

H.   Collateral Mortgage and Collateral Chattel Mortgage and Assignment of Leases and Rents dated 10/7/1988, recorded in Entry No. 88-03087, Lafayette Parish, Louisiana to Security Pacific National Bank, et al.

I.   Notice of Assignment dated 10/7/1988, recorded in Entry No. 88-30873, Lafayette Parish, Louisiana to Security Pacific National Bank.

J.   Affidavit to Cancel Inscription dated 5/24/1990, recorded in Entry No. 90-16443, Lafayette Parish, Louisiana to Security Pacific National Bank, et al.

ENCUMBRANCES:

A.   Servitude and Right-Of-Way dated 7/20/1966 recorded in COB L-50, Folio 19, Entry No. 498243, Lafayette Parish, Louisiana to City of Lafayette.

B.   Agreement dated 4/20/1979, recorded in Entry No. 79-009772, Lafayette Parish, Louisiana to Simon and Sons.

C.   Street and Highway Easement dated 9/26/1979, recorded in Entry No. 80-04988, Lafayette Parish, Louisiana to City of Lafayette.

There are no records of wells drilled on these lands as per the Lafayette District of the Louisiana Department of Natural Resources - Office of Conservation records.

It should be noted that the findings presented above reflects very little to NO USE on the subject property. It should be pointed out however, that this NO USE could be misleading due to the following:

On September 16, 1991 an interview was conducted at the Lafayette District for Southern Pacific Transportation Company with Mr. Jim Armentor, Property Manager. During the course of the interview we were advised that it was the policy of Southern Pacific to grant leases, subleases, etc. to a variety of entities, people, etc. and not place these documents of record in the appropriate records of Lafayette Parish, Louisiana, which would make it impossible for third parties to determine accurately the use of the lands being examined. Due to this policy we asked Mr. Armentor if we could examine the records of Southern Pacific, its successors, heirs or assigns and he advised that they do not maintain these records in Lafayette, Louisiana, but did store them in there offices in Houston, Texas, however, it was his understanding that those records were regularly purged from their files and destroyed and he felt these older records had in fact been destroyed.

-8-

Based on the above we contacted Mr. Barry Gondron - Contracts Manager with Southern Pacific Transportation Company on October 11, 1991 to discuss the availability of the records and he advised that Mr. Armentor's assessment of the situation was accurate. However, he felt that the records may not have been destroyed but he was not aware of the possible location of them if they had not been destroyed.

Additionally, in our review of the records of Lafayette Parish, Louisiana it should be noted that in reviewing various documents we could not determine if they affected the tract of land being examined. This was caused by the lack of plats available and the vagueness of the descriptions used in the various documents and some documents were missing from the records altogether therefore, based on the above there could be additional documents that affect this tract which are not listed above and could affect our determination of the usage of this tract.

Larry W. Blanchard
Land Manager
C. H. Fenstermaker & Associates, Inc.

-9-

## DATA SEARCH & REGULATORY REVIEW

As part of a typical Phase I Environmental Site Assessment of property having a history of manufacturing, commercial or industrial usage, a data search and record search of regulatory agencies is conducted in order to determine what, if any, information, release reporting or registration(s) exists or is applied for which might reveal a potential for contamination or indicate the possible presence of contamination. As a direct result of the review of information employed in this assessment for determining historical usages on the subject property, the following entities were considered to possibly maintain this potential and were therefore included in the regulatory review:

> Southern Pacific Transportation Company
> Southern Pacific Company

The investigation was conducted by telephone and by visits to the Louisiana Department of Environmental Quality in Baton Rouge, Louisiana and the United States Fish & Wildlife Service in Lafayette, Louisiana. This review in no way implies that any permitting, licensing, registering of reporting is or is not required by the respective agency, such determination being made by CLIENT. Following is a summary of findings:

* Aerial Photography *

> A visit to the U.S. Fish & Wildlife Service produced an infrared satellite photograph of the subject property and surrounding area. The photo was dated 11-16-83 and is registered as number 83-154. No uses or observations other than those typically found in similar areas were noted by inspection of the photo. An additional infrared satellite photo dated 12-05-81 was also obtained and evaluated. This photo is registered as number 83-148, a copy of which is presented as Figure 2. Again, no uses other than those typically observed in similar areas were noted by inspection of the photo.

* CERCLIS List of Louisiana Sites *

> Review of the August 1, 1991 CERCLIS list provided by the Louisiana Department of Environmental Quality and produced by the United States Environmental Protection Agency confirmed that the site was not listed nor were any adjacent properties listed.

-10-



**\* DEQ Inactive and Abandoned Site (IAS) Potential Site Listing \***

Review of this List dated December 18, 1990 and provided by the Louisiana Department of Environmental Quality demonstrated that the subject property or any adjacent properties were not listed. However, two sites approximately 1800 feet in a Northwesterly direction were listed as Record #'s 495 and 496 bearing Site Name Southern Mill & Supply / Buchanan and Southern Mill & Supply / Monroe, respectively. An attempt was made to review records on these sites within the files of the Louisiana Department of Environmental Quality's - Inactive and Abandoned Sites Division, however no files were present in the Division's File Room and no information was available.

**\* National Priorities List (NPL) of Uncontrolled Hazardous Waste Sites \***

Review of the February 11, 1991 NPL published in 56 Federal Register, confirmed that the site was not listed nor were any adjacent properties listed.

**\* Landfills/Solid Waste Facilities \***

Contact was made with Pam Kimball of the Louisiana Department of Environmental Quality - Solid Waste Division. A search of the Solid Waste Site Listing for facility registrations as a generator, disposer, processor, transporter or exempted facility with respect to commercial or industrial solid waste yielded no registration of the mentioned entities.

**\* Underground Storage Tanks \***

Contact was made with Barbara Mason of the Louisiana Department of Environmental Quality - Underground Storage Tank Division in order to research the active list of registered underground storage tanks (UST). An initial telephone call to Mrs. Mason indicated that a registration by Southern Pacific Transportation Company, 210 Johnston St., Lafayette Louisiana, for a UST had in fact been located within the Divisions computer data base. However, upon a follow up visit to the Division office in Baton Rouge on October 9, 1991, the file was not able to be located within the Divisions records. The whereabouts of the file was unknown.

-11-

\* Hazardous Waste Generators/Transporters \*

Contact was made with Peggy Moak of the Louisiana Department of Environmental
Quality - Hazardous Waste Division.  A search for notifications, permits or
applications by the referenced entities as a generator, disposer, storer or transporter
of hazardous wastes disclosed that one such notification had in fact been submitted
to the Hazardous Waste Division by SPTC.  However, the notification dated 8/80,
which applied to 810 Evangeline Thruway, was now listed in the inactive files.
Therefore, Brenda Davis - File Clerk for the Division was contacted in an effort to
locate this notification.  Mrs. Davis was not able to locate this notification and
recommended that the U.S. EPA Region VI Office be contacted for this purpose.
The original notification was not obtained for review, however it is assumed that this
notification was applicable to SPTC at the address reported.

\* Air Quality \*

Barbara Williamson of the Louisiana Department of Environmental Quality - Air
Quality Division reviewed the list of current holders of air emission permits.  It was
established during a follow-up visit to this Division that the entities in question were
not included in the current list.

\* Nuclear Energy \*

Contact was made with Shirley Starns with the Louisiana Department of
Environmental Quality - Radiation Protection Division.  After review of the current
list of licensees to receive, acquire, own, possess and transfer radioactive materials,
it was determined that SPTC had in fact applied for and obtained such a permit.
Upon a follow up visit to this Division and review of the file, it was apparent that
SPTC, 210 Johnston Street, Lafayette, Louisiana was licensed to store and use
Radium 226 for use in a Troxler Electronic Laboratory, Inc. Model 2401 Unit.  The
license allowed this equipment to be used at temporary jobsites within Louisiana.
Contact was made with Barry Gondron SPTC - Houston Office in order to verify the
storage location of the Radium 226.  Mr. Gondron stated that this radioactive
material was stored within SPTC's facilities located on the South side of Johnston
Street and that this storage location was not located on the property for which this
assessment is prepared.  SPTC's Radioactive Materials License has been reported
terminated as of 1/31/91 with all radioactive material disposed of in accordance with
the Louisiana Radiation Regulations.

\* Water Resources \*

A record search of the Louisiana Department of Environmental Quality - Office of
Water Resources file room provided no evidence of application by the entities for a
water or wastewater discharge permit at this location.

-12-

**\* Sanborn Fire Insurance Maps \***

In order to assist in developing a working history of the site which focuses on usages of the subject property, Sanborn Insurance Maps were reviewed beginning with maps dating from August 1912 to October 1940. Some of the original maps are maintained at the University of Southwestern Louisiana Library, however most of the maps have been copied to microfilm. Copies of these maps are presented in chronological order in Appendix A. The buildings and structures shown on these plats have been reported to have been used by Southern Pacific Transportation Company personnel and more specifically, personnel of the Bride & Building Department of SPTC. Following is a listing and description of structures observed from the Sanborn Maps:

AUGUST 1912

1 Yard Office
2 Tool Houses
1 Unidentified Structure
1 4" Water Pipe
Miscellaneous R.R. Tracks

NOVEMBER 1921

2 Office Houses
2 Oil Houses
3 Lumber Sheds
6 Unidentified Structures
1 Supply Warehouse surrounded by wooden platform
Lumber & Timber Piles
2 4" Water Pipes
1 8" Water Pipe
1 2" Hydrant
Miscellaneous R.R. Tracks

-13-

Case 6:16-cv-00347-SMH-CBW   Document 1-4   Filed 03/14/16   Page 35 of 100 PageID #: 53

APRIL 1928

2 Office Houses
2 Oil Houses
1 Dynamite Storage Structure
1 Concrete Work House
1 Cement Storage Structure
1 Paint House
1 Stock Room surrounded by wooden platform
3 Storage Structures
5 Unidentified Structures
1 Tin Shop
1 Carpentry Shop
1 Blacksmith Shop with earth floor
1 6" Water Pipe
1 8" Water Pipe
4 Dual Fire Hydrants
Lumber Piles
Miscellaneous R. R. Tracks


OCTOBER 1940

2 Office Houses
1 Oil House
1 Dynamite Storage Structure
1 Lumber Storage House
1 Cement Storage Structure
1 Stock Room surrounded by wooden platform
2 Storage Structures
4 Unidentified Structures
1 Tin Shop
1 Carpentry Shop
1 Blacksmith Shop with earth floor
1 6" Water Pipe
1 8" Water Pipe
4 Dual Fire Hydrants
Lumber Piles
Miscellaneous R. R. Tracks

-14-

ClerkConnect Document Viewer

**FIGURE 2**

*INFRARED PHOTO*

-15-



### FIGURE 2

#### INFRARED PHOTOGRAPH

LOCATION OF PROPERTY BELONGING TO

## SOUTHERN PACIFIC
## TRANSPORATION COMPANY

SITUATED IN SECTION 67, T9S - R4E
LAFAYETTE PARISH, LOUISIANA

| Scale | No Scale | C H Fenstermaker & Associates, Inc |
| Date. | October 1981 | Civil Engineers & Land Surveyors |
| Drawn By | VSP | Lafayette & New Orleans, Louisiana |

## SITE INSPECTION & INTERVIEWS

A visual site inspection of the property identified as Tract "B" in the plat presented in Figure 1 was performed on October 4, 1991 by a representative of C. H. Fenstermaker & Associates, Inc., Mr. Harvey Mouhot a retired SPTC employee and Mr. Jim Armentor, Property Manager for SPTC. Notes locating positions of the findings presented below are also included in Figure 1. It should be noted that the conditions found at the site and discussed in this report are relevant only to the days referenced herein and no warranty is given that the observations which follow are indicative of the conditions which may exist at present. Photographs of the site and/or peculiar findings were taken in order to document relevant observations. Photographs are presented in Groups in Appendix B. The inspection and interviews yielded the following observations and testimonies:

A.   As shown in Photo Group 1 the property was posted to trespassing by Southern Pacific Transportation Company (SPTC). The site was covered with a sparse layer of native grasses and weeds. Some old concrete pads were noted in several locations throughout site. Mr. Mouhot indicated that these concrete pads may have been foundations for former sheds, buildings and storage houses utilized by SPTC and the Bridge & Building Department of SPTC.

B.   Photo Group 3 shows evidence of the Blacksmith Shop and concrete slab located on the property along Chestnut Street. Inspection within the Blacksmith Shop indicated that the structure was actively being used for storage of R.R. supplies such as hydraulic jacks and various galvanized fastening systems. The concrete slab is believed to have be used at one time for storage of lumber. As shown in the photos, this slab was equipped with a floor drain and drain line. The sides and bottom of the drain are constructed of concrete. The drain line lay in a Northerly direction, however there was no obvious evidence of the location of discharge. Utilities associated with this property noted during the inspection appear to consist of water lines and a natural gas service riser and possible service line (Photo Group 1). Approximate locations of utilities are shown on the Site Plan in Figure 1 and in the Sanborn Maps in Appendix A. A billboard is also located on the subject property along Johnston Street. Four elevated electrical transformers on power poles were noted as located in Figure 1 along Chestnut and Johnston Streets adjacent to the site. The locations of the power poles and transformers appear to be within public rights-of-way. Two of these transformers are shown in Photo Group 3 on the right side of the top photo. In order to confirm the absence or presence of PCB containing oils in these transformers Frank Frye, Regulatory Compliance Specialist for the Lafayette Utilities System was contacted. Mr. Frye stated that he would have the oils in each of the transformers in question sampled and analyzed for PCB's.

C.   The property is bound by Lee Street, Chestnut Street, Johnston Street-U.S. Highway 167 and the Southern Pacific Transportation Company 90' Right-of-Way on its North, East, South and West borders, respectively. Property immediately adjacent to these roadways and railroad tracks consist of residential dwellings, an automotive repair shop, an office building of the Salvation Army and property owned by Southern Pacific Transportation Company. It was apparent that SPTC is actively using the property located to the North of Lee Street for storage of miscellaneous railroad

-16-

supplies such as ties, rail, pipe etc. A portion of this property is presently leased to E.P. Breaux Electrical Inc. Location of adjacent property occupants is presented in Figure 1. No obvious contamination was noted during inspection of these properties.

D.   An interview with Mr. Jim Armentor - Property Manager for SPTC, was conducted on September 16, 1991. Mr. Armentor stated he has been employed by SPTC for 33 years and that he was somewhat familiar with the subject property. When questioned as to if any former leases were available within SPTC's files which might reveal historical usages on the property, Mr. Armentor responded by indicating that as part SPTC's routine operations, files containing outdated records, expired leases etc. were usually purged and discharged on a regular basis. Mr. Armentor was then questioned as to whether SPTC recorded any of their lease agreements within the parish courthouse. He indicated that SPTC's customary practice was to record lease agreements only at the request of the lessor, however Mr. Armentor mentioned that at one time Barber Brothers Construction may have executed a lease to construct a temporary concrete or asphalt plant on the site during the construction of Johnston Street.

Mr. Armentor was then asked if any maps or plats of the property might be made available which would show locations of former buildings, structures, rail alignments etc. on the property. The plats presented as Figures 1 and 1-A were provided. Additionally, Mr. Armentor provided the contact of Barry Gondron and indicated that he may be able to provide supplemental mapping information. Mr. Gondron was contacted at SPTC's Houston Texas office and was requested to provide any maps, blueprints or pertinent information. After approximately one week, Mr. Gondron was again contacted, however he was unable to locate any maps or information on the subject property which would be of any use. As shown in Figure 1-A, an Underground Storage Tank (UST) and associated pumps were revealed. Further questioning indicated that the Tank had been used for fuel storage for SPTC's automobiles. Mr. Armentor then supplied a contact name of Harvey Mouhot and indicated that Mr. Mouhot would most likely have more information concerning the Tank.

Mr. Armentor was then questioned as to his knowledge of or information pertaining to chemicals or hazardous waste storage, contamination, permits, etc. which might be available. He indicated that he was unaware of any such data, however Mr. Armentor did offer the name of Robert Taegar as a contact which may be helpful in supplying this type of information. More specifically, Mr. Armentor indicated that Mr. Taegar would have information relative to a "Red Flag Checklist" which reflects an in-house, cursory environmental review by Southern Pacific personnel.

E.   Upon contacting Mr. Robert Taegar in SPTC's Dallas Texas office, a copy of the Red Flag Checklist was allowed to be borrowed. The checklist was dated 8-14-91 and as previously asserted had been executed by Southern Pacific Environmental Systems Railroad Division. The list was reviewed, however offered no additional pertinent information relative to this assessment.

-17-

F.   Mr. Harvey Mouhot, Utilities Manager for SPTC was employed for a 35 year period from 1948 through 1983. A telephone interview was conducted with Mr. Mouhot on September 18, 1991. As stated by Mr. Mouhot, the UST's shown in Figure 1-A were actually two 10,000 gallon tanks located in the approximate positions shown. One tank was reported as storing diesel and was buried underground (UST) while the second was reported as a 10,000 gallon gasoline aboveground storage tank (AST). This gasoline tank was reported as being a railroad tank car and rested on concrete cradles. Mr. Mouhot continued on to state that the UST had been excavated and removed approximately 10 years prior to the present. Mr. Mouhot then stated that to the best of his recollection the hole was backfilled with sand which was hauled in from offsite. Mr. Mouhot recalled the name of the contractor responsible for tank removal as Mr. Irving Thibodeaux.

Upon inspecting the former UST and AST sites, Mr. Mouhot recalled the locations quite specifically. Upon closer inspection of property located North of Lee Avenue the concrete cradles used to support the AST were located. Mr. Mouhot then recalled the dimensions of the UST as approximately 8' X 30'. These dimensions were used in estimating where the UST site had been. According to this estimation the UST appears to have been under what is now Lee Street.

While walking the site near the Northwest corner of the property Mr. Mouhot recalled that two AST's, supported by cradles, had been situated in the area for storage of diesel fuel. Mr. Mouhot stated that the AST's had been former railroad tank cars which held a capacity of 12,500 gallons each. These tanks were used to refuel eastbound passenger trains. This was accomplished by transporting the fuel through a buried 4" screwed galvanized flowline which Mr. Mouhot recalled as laying in a westerly direction across the site to a point near the tracks as shown in Figure 1. The flowline was reported to be equipped with a pump located at the refueling point which created a suction operated transfer process.

G.   Upon completion of the visual site inspection of the property, Mr. Mouhot was questioned as to usages of the structures presented in the Appendix A Maps. Mr. Mouhot offered information and stated that the majority of the structures on the property were used by the Bridge & Building (B & B) Department of SPTC. Mr. F.V. "Pappy" Landry was then contacted in an effort of locating an individual associated with the B & B Department. Mr. Landry offered the name of Mr. E.J. Camelle as a contact for this information. Therefore, an additional interview was conducted with Mr. Camelle, Bridge & Building Supervisor for SPTC from 1940 to 1975. Mr. Camelle had been associated with the Lafayette yard and this site from 1958 to his retirement in 1975. He was questioned in reference to the various Oil Storage Houses located throughout the site as shown in the maps presented in Appendix A. Mr. Camelle stated that the purpose of these Oil Houses was to store oil and packings for lubrication and maintenance of rail car journal bearings. When asked to elaborate on this subject Mr. Camelle indicated that as part of routine maintenance, when trains would come in and stop inspectors would examine each of the rail car's journal boxes and bearings. The boxes would be lubricated with the oil stored in the houses and packings within the journal boxes were replaced as

-18-

necessary. Mr. Camelle was then asked at what location was the majority of railcar and locomotive maintenance performed. He responded by indicating that most maintenance procedures occurred in the "roundhouse" yard which was located across Johnston Street. When questioned in reference to the Dynamite Storage Shed, Mr. Camelle responded that the Shed was not present when he was put in charge of the Johnston Street yard in 1958 and therefore did not have information relative to the structure. Mr. Camelle was further questioned as to his knowledge of the presence of chemicals or hazardous materials stored or utilized on the property during his association with this site. He responded by indicating that he was unaware of any such information, however Mr. Camelle did state that small amounts of unused paint were usually stored in the Paint House which is shown on the April 1928 map in Appendix A.

H.      Information compiled from interviews indicate that uses associated with the remainder of the Shops and Structures presented on the Maps in Appendix A are self describing. For instance, the Carpentry Shop and Tin Shop were used for carpentry work and tin work, respectively. Although several attempts were made to identify usages associated with unidentified structures located on these maps, descriptions were not presented nor was information discovered. However, the Supply Warehouse presented on the November 1921 Map and again on the April 1928 and October 1940 Maps was reported to originally store miscellaneous materials for use by SPTC personnel, however at some point in time this Warehouse was reported to be transformed into a wholesale outlet to sell damaged freight to the general public. It should be noted that the structures identified in the Appendix A maps sometimes served multiple functions throughout the years. For instance the Concrete Work House shown on the April 1928 map was used for lumber storage in 1940. It should also be noted that lumber and timber has been stored on the property as shown on the November 1921 maps and that some of this lumber was preserved with creosote.

I.      A telephone interview was conducted with Mr. Leroy Barber - Barber Brothers Construction on October 10, 1991. Mr. Barber was questioned as to if in fact Barber Brothers Construction had built a temporary asphalt and/or concrete plant on the site during construction of Johnston Street. Mr. Barber replied that to the best of his knowledge a temporary concrete plant was situated on the southeastern portion of the property around the 1950's. Mr. Barber was then questioned as to his knowledge of any environmentally sensitive processes involving the concrete plant and its operation on the site. Mr. Barber stated that sand and gravel aggregates were stockpiled on the site and cement was stored in a tank and no environmental problems were encountered.

-19-

## CONCLUSION

Based on the foregoing investigations, research, inspections and evaluation of data as presented in this report and obtained in reference to the property herein described, it is not possible to determine the presence or absence of contamination at this site. In order to make this determination a Phase II type assessment would be required.

Following are areas of concern which warrant further investigation:

A)   Given the nature and strength of evidence indicating the former presence of an Underground Storage Tank (UST) and the quality of information substantiating this finding, the potential for contamination of soils and/or groundwater does exist. Corroded flowlines, ruptured tanks, and spillage are but a few sources which could contribute to contamination. In this instance, diesel was reported as contents stored and potential contamination would most probably be representative of this hydrocarbon. Actual concern involved with this former UST location is of course the possibility of onsite contamination. Potential concern, given the location of this UST near a property boundary, is the capacity for possible contamination to migrate offsite.

Hydro-Environmental Technology, Inc., P.O. Box 31203, Lafayette, LA., 70593-1203 has been contracted by the City of Lafayette to perform a Phase II study in reference to the former UST site.

B)   Possible presence of PCB containing oils within electrical transformers located adjacent to the subject property in what appears as public rights-of-way.

As previously stated, the oils within the transformers are presently being analyzed for PCB's under the authority of Mr. Frank Frye, Regulatory Compliance Specialist - Lafayette Utilities System.

-20-

It should be noted in reference to the following areas of concern, A, B, C, and D, the nature and strength of evidence indicating the possible presence of contamination in each respective case, and the quality of information substantiating this evidence should be included in consideration of determining the need for further investigation.

Following are areas of concern which may warrant further investigation:

A)   Unknown purpose of the floor drain and drain line associated with the concrete slab documented in Photo Group 3.

B)   Possible presence of contamination in the area of the two former 12,500 gallon Aboveground Storage Tanks and the associated flowline.

C)   Possible presence of contamination in the area of the former Dynamite Storage structure.

D)   Possible presence of contamination in the areas of the former Oil Storage Houses.

Although it is impossible to detect obvious contamination at this site within the limits of this assessment, it is FENSTERMAKER'S opinion that this Phase I Site Assessment provides the CLIENT with a thorough and due diligent investigation: 1) into the past usages of the property which could contribute to or reveal a potential for contamination and 2) to discover the possible presence of onsite and neighboring property contamination.   The assessment also assists in establishing a solid foundation upon which a Phase II type assessment can more readily be designed and implemented should the necessity ensue.

-21-

# APPENDIX A

# Sanborn Fire Insurance Map

## *AUGUST 1912*



**Sanborn Fire Insurance Map**

*NOVEMBER 1921*



# Sanborn Fire Insurance Map

## APRIL 1928



**Sanborn Fire Insurance Map**

*OCTOBER 1940*



Case 6:16-cv-00347-SMH-CBW   Document 1-4   Filed 03/14/16   Page 53 of 100 PageID #:  71

**APPENDIX B**



Photo Group 1 –
Property –
Water Wires +
Net. Gas view
Service line



PRIVATE
PROPERTY
NO
TRESPASSING
S.P. TRANS. CO.
P.O. BOX 3667
AEX LA 70502

*PHOTO GROUP 1*



ClerkConnect Document Viewer                                                    Page 58 of 200





*PHOTO GROUP 2*



ClerkConnect Document Viewer







*PHOTO GROUP 3*

# APPENDIX C



# Southern Pacific
# Transportation Company

4599 McEwen • Suite 800 • Dallas, Texas 75244

September 26, 1991

File: "S" - Johnston St. - Lafayette, LA

Mr. E. R. DesOrmeaux
705 West University Avenue
P. O. Box 4017-C
Lafayette, LA 70502

Facsimile #(318) 261-8399

Re:  Right-of-Entry Permit for an Environmental Assessment

Dear Mr. DesOrmeaux:

SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware corporation ("Permittor"),
hereby permits City of Lafayette, a governmental municipality ("Permittee"), to
enter upon Permittor's property located at Lafayette, Parish of Lafayette, State
of Louisiana ("Premises"), as illustrated on Permittor's Drawing No. RED-42012
dated September 19, 1991, attached and made a part hereof, subject to all
licenses, easements, encumbrances and claims of title affecting the Premises and
upon the following terms and conditions:

1.   This permit is for Permittee's exclusive use and is not assignable.  It is
     hereby given to Permittee solely for the purposes of an Environmental
     Assessment to include a sampling investigation for collection of surface
     and subsurface soil samples and installation and sampling of temporary
     groundwater monitoring wells.

2.   This permit shall be effective for a period of thirty (30) days from the
     above date and shall automatically terminate thereafter. Notwithstanding
     the term hereof, Permittor reserves the right to revoke this permit at any
     time prior to termination date upon twenty-four (24) hours' advance notice
     from Permittor to Permittee.

3.   All costs related to Permittee's operations upon the Premises shall be at
     Permittee's expense and all work by Permittee upon the Premises shall be
     performed in a good and workmanlike manner satisfactory to Permittor.
     Since there is the possibility of the existence of pipelines or other
     structures beneath the Premises, if Permittee should excavate or drill,
     then Permittee's forces shall explore such structures with hand tools to
     a depth of at least eight feet (8') below the surface of the ground or, at
     Permittee's option, use suitable detection equipment prior to drilling or
     excavating with mechanized equipment.  Absence of markers does not
     constitute a warranty by Permittor of no subsurface installations.

Page 2

4.  Any open holes shall be satisfactorily covered at all times when
    Permittee's forces are not physically working in the actual vicinity
    thereof.   Upon completion of work, all holes will be filled in to
    surrounding ground level with clear, compacted, earthen material and the
    Premises left in a neat and safe condition satisfactory to Permittor.

5.  Permittee shall fully pay for all materials joined or affixed to the
    Premises, and shall pay in full all persons who perform labor thereupon.
    Permittee shall not suffer any mechanics' or materialmen's liens of any
    kind to be enforced against the Premises for any work done or materials
    furnished at Permittee's request.   If any such liens are filed thereon,
    Permittee shall immediately remove the same at Permittee's own expense,
    and shall pay any judgment which may be entered thereon or thereunder.
    Should Permittee fail, neglect, or refuse so to do, Permittor shall have
    the right to pay any amount required to release any such liens, or to
    defend any action brought thereon, and to pay any judgment entered
    therein; and Permittee shall be liable to Permittor for all costs,
    damages, reasonable attorneys' fees, and any amounts expended in defending
    any proceedings or in the payment of any of said liens or any judgment
    obtained therefor.   Permittor may post and maintain upon the Premises
    notices of nonresponsibility as provided by law.

6.  Permittee shall release, defend (with counsel satisfactory to Permittor)
    and indemnify Permittor from and against all liability, cost, and expense
    for loss of or damage to property and for injuries to or death of any
    person (including, but not limited to, the property and employees of each
    party hereto) when arising or resulting from the use of the Premises by
    Permittee, its agents, employees, or invitees; or Permittee's breach of
    the provisions hereof.   The term "Permittor" as used herein includes, in
    addition to Permittor, Permittor's subsidiaries and affiliates, and the
    successors and assigns of any of them, and any other railroad company
    operating upon Permittor's tracks.

    To insure Permittor's contractual liability hereunder, Permittee, or, at
    the option of Permittee, Permittee's Agents or its Consultants, shall
    provide Permittor satisfactory evidence of Comprehensive General Liability
    Insurance and Automobile Liability Insurance, terminable only after ten
    (10) days' advance written notice to Permittor, each in an amount of not
    less than TWO MILLION DOLLARS ($2,000,000.00) combined single limit per
    occurrence for Bodily Injury and Property Damage. The insurance policies
    shall name Permittor as additional insured and shall contain a waiver of
    any right of subrogation against Permittor.

**Page 3**

7.  Permittee shall comply, at Permittee's expense, with all applicable laws, regulations, rules, and orders with respect to the use of the Premises, regardless of when they become or became effective, including, without limitation, those relating to construction, grading, signage, health, safety, noise, environmental protection, waste disposal, and water and air quality, and furnish satisfactory evidence of such compliance upon request of Permittor.

Should any discharge, leakage, spillage, emission, or pollution of any type occur upon or from the Premises due to Permittee's use and occupancy thereof, Permittee, at Permittee's expense, shall clean all property affected thereby to the satisfaction of Permittor and any governmental body having jurisdiction thereover.

Permittee shall indemnify, hold harmless, and defend Permittor against all liability, cost and expense (including, but without limitation, any fines, penalties, judgments, litigation costs, attorneys' fees, and consulting, engineering and construction costs) incurred by Permittor as a result of Permittee's breach of this section or as a result of any such discharge, leakage, spillage, emission or pollution, regardless of whether such liability, cost or expense arises during or after the term of this permit.

Permittee shall pay all amounts due Permittor under this section within ten (10) days after any such amounts become due.

This section shall not apply to any discharge, leakage, spillage, emission or pollution already upon the Premises and discovered as a result of any Environmental Surveys.

8.  Any person, firm or corporation Permittee authorizes to work upon the Premises shall be deemed to be Permittee's agent and shall be subject to all the applicable terms hereof.

9.  Permittee is hereby required to give three (3) days' advance notice of the date Permittee elects to enter upon the Premises. Said notice shall be to the undersigned by telephone at (214) 372-4300, and then confirmed by letter to the above address.

If any facility of Permittor is endangered by Permittee's work, Permittee shall immediately notify said Southern Pacific Transportation Company at the above number; and, in the event any of Permittor's facilities is damaged as a result of Permittee's operations upon the Premises, Permittee shall reimburse Permittor for any cost expended to repair or replace the facility so damaged upon presentation of bill therefor.

**Page 4**

10. Neither Permittee, Permittee's Agents or its Consultants shall make any contacts or communications to any governmental agency, department, district or board (each a "Governmental Agency") in connection with any information, reports, evaluations and surveys generated in connection with any Environmental Surveys unless compelled by law to do so. Any such information, reports, evaluations and surveys generated in connection with any Environmental Surveys which Permittee or Permittee's Agents or its Consultants are compelled by law to report to any Governmental Agency, shall be submitted to Permittor concurrently with the submission of such items to the Governmental Agency.

11. All written reports, evaluations and surveys produced by Permittee and any of its Agents or Consultants in connection with any Environmental Surveys (whether preliminary, interim or final in nature) shall be submitted to Permittor concurrently with the submission of such items to Permittee.

12. Prior to the issuance of any final report by Permittee or any of its Consultants or Agents which will set forth any "baseline" determination for the Premises and/or any recommendations relating to the removal, monitoring, clean-up or containment of any Hazardous Materials, Permittor shall be given the opportunity to make comments, question and offer recommendations to the Permittee and any of its Consultants or Agents preparing such reports; and

13. Except as set forth in Section 10, Permittee and Permittee's Agents and Consultants shall maintain in confidence any and all information, reports, evaluations and surveys generated in connection with any Environmental Surveys, and Permittee and Permittee's Agents and Consults shall not make any disclosure of any such information, reports, evaluations and surveys to any other person or entity without the prior written consent of Permittor.

14. By signing this permit, Permittee acknowledges that any and all feasibility or marketing reports, environmental assessments, engineering studies and other information of any type that Permittee has received or may receive from Permittor or its agents are furnished on the express condition that Permittee shall make an independent verification of the accuracy of any and all such information, all such information being furnished without any warranty whatsoever. Permittee agrees that it will not attempt to assert any liability against Permittor and/or its agents for furnishing such information. Furthermore, such information furnished by Permittor or its agents to Permittee shall be treated with same confidentiality as information developed by Permittee pursuant to terms of this permit.

15. If the Environmental Assessment discloses any hazardous substances, either party shall have the right, at their sole discretion, to terminate any lease or sale negotiations which may be in progress.

Page 5

16.   Permittor's or Permittee's termination of lease or purchase negotiations
      shall not relieve Permittee from any liability for any damages incurred by
      Permittor by reason of breach by Permittee of any of the terms of this
      right of entry permit.

17.   This permit is intended to supercede and terminate prior permit covering
      same property dated September 19, 1991.

If Permittee agrees to the foregoing terms, please have Permittee's authorized
officer endorse Permittee's acceptance on the attached copy of this letter and
return to undersigned.  If the endorsed copy is not received within ten (10) days
from the date of this letter, this permit shall automatically terminate.

                                        Very truly yours,


                                        Jerry Baumbach
                                        Regional Director

RJC/cm51
092691

cc:   Mr. Glen Weber, CAO
      Facsimile #(316) 237-0407


AGREED TO AND ACCEPTED THIS 30ᵗʰ DAY OF September, 1991.


By _____

Title: Chief Admin. Officer


                                        FILED THIS
                                        DAY OF _____, 20 16
                                        _____
                                        Deputy Clerk of Court

RECEIVED BY

JUL 21 1993

GROUND WATER
PROTECTION DIVISION

*PHASE II & III received*
*NO COVER LETTER*

*LAD II*
*9-22-93*

# Phase II Site Investigation
### Southern Pacific Transportation Company Property
### Johnston Street Frontage
### Lafayette, Louisiana
### November 6, 1991

Prepared for

**Mr. Ray Desormeaux**
**Consultant – City of Lafayette, Louisiana**

FILED THIS ___ 
DAY OF ___, 20__
Deputy Clerk of Court

By

**HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.**
104 R. Savonne Drive
Scott, Louisiana
70583
(318) 261-1963


EXHIBIT
B

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Introduction | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
|     Previous Investigations | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
|     Areas of Environmental Concern | . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Method of Investigation and Results of Analysis | . . . . . . . . . . . . . . . . . . . . . | 2 |
|     Site Description | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
|         Area 1 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
|         Area 2 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
|         Area 3 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
|         Area 4 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| Conclusions | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| Recommendations | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |

## List of Figures

| Figure 1. | Location Map | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
|---|---|---|---|
| Figure 2. | Site Plan Map | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| Figure 3. | Site Plan Map of Area 1 | . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| Figure 4. | Site Plan Map of Area 2 | . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| Figure 5. | Site Plan Map of Area 3 | . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| Figure 6. | Site Plan Map of Area 4 | . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |

## List of Appendices

| Appendix A. | Geologic Logs | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
|---|---|---|---|
| Appendix B. | Laboratory Analyses | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |

# INTRODUCTION

Previous Investigations

In October, 1991, C.H. Fenstermaker and Associates, Inc. ("Fenstermaker") conducted a Phase I Environmental Site Assessment for the City of Lafayette on the Southern Pacific Transportation Company property with frontage along Johnston Street in Lafayette, Louisiana. Conclusions in this report indicated that areas of the property had potential for environmental concerns and warranted further investigation.

Areas of Environmental Concern

The Fenstermaker report indicated that six (6) areas of this property may warrant further investigation. These six areas were described as follows:

    1.      The former 10,000 gallon underground diesel storage tank located along the western portion of the property.

    2.      Possible presence of Polychlorinated Biphenyls (PCB) oils within electrical transformers located adjacent to subject property.

    3.      The unknown purpose of the floor drain and drain line associated with concrete slab along the northern portion of the property.

    4.      The possible presence of contamination resulting from the two (2) former 12,500 gallon aboveground storage tanks in the eastern portion of the property.

    5.      Possible contamination in the area of the former dynamite storage structure.

    6      The possible presence of contamination in the area of the former Oil Storage Houses.

Hydro-Environmental Technology, Inc. (HET) was contacted in the Month of October, 1991 to investigate selected areas of the property described by the Fenstermaker report as needing additional investigation. This investigation was conducted at the request of Mr. E.R. Desormeaux, Consultant for the City of Lafayette, Louisiana. Areas of concern listed above as number 2 and number 5 were not addressed during this investigation.

1

2

## METHOD OF INVESTIGATION AND RESULTS OF ANALYSIS

### Site Description

The Southern Pacific Transportation Company property investigated ("the site") is located within the city limits of Lafayette, Louisiana. The site is geographically described as Section 67, Township 9 South, Range 4 East Lafayette Parish, Louisiana (Figure 1). This site is bound on the north by Chestnut Street, on the south by Southern Pacific Transportation Company railroad tracks, on the east by Johnston Street and on the west by Lee Street. Located on this 5.1061 acre parcel of land are one building structure, concrete slabs or the remnants of the slabs, spot paving and open vegetated acreage. For the purposes of discussion, the site will be divided into the four sections investigated and labeled Area 1, Area 2, Area 3 and Area 4 (Figure 2).

### Area 1

The portion of the property investigated along Lee Street and in the vicinity of the former underground storage tank was identified as Area 1 (Figure 2). Information received during an initial site visit at the property, indicated at one time that Lee Street did not exist across the property and in the present position. Conversations with Mr. Harvey Mouhart, former Utility Director of the Southern Pacific Transportation Company, indicated that the former tank was 10,000 gallons in size and located in a northeast-southwest orientation under what now is Lee Street. Mr. Mouhart indicated that the contents of this tank was Diesel fuel. The actual location of this former tank appears to be beneath Lee Street and possibly abutting the site.

On October 11, 1991, HET installed two soil borings (SB1 and SB2) at the site to determine if the former contents of the underground storage tank had impacted site soil conditions. The soil borings were installed utilizing hand auger methods and installed to depths of eleven feet below land surface. The location of soil boring SB1 and SB2 are illustrated in Figure 3. Soil samples were collected by shelby tube methods during the installation of soil boring SB1 and SB2 at composite depths of five to six feet and eleven to twelve feet below land surface. Complete geologic logs of all soil boring installed in area 1 are contained in Appendix A. Soil samples were collected when bucket augers had been drilled to predetermined depths

ClerkConnect Document Viewer



| KPM<br>Drawn By | SLS<br>Approved By | 1051-01<br>Project # | 11-3-01<br>Date |
|---|---|---|---|

| Figure 1. | Location map of Southern Pacific Transportation Company property investigated, Lafayette, Louisiana. Source: USGS 7.5 Minute Series Lafayette and Broussard Louisiana Quadrangles. | HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.<br>ENVIRONMENTAL CONSULTANTS<br>104 N Savanne Drive<br>Scott, LA 70583<br>(318) 261-7893 |
|---|---|---|



Figure 2.   Site plan map.

HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.
ENVIRONMENTAL CONSULTANTS
104 R. Savonne Drive
Scott, LA 70583
(318) 261-1963



NORTH

LEE STREET

APPROXIMATE LOCATION OF
FORMER 10,000 GALLON DIESEL
UNDERGROUND STORAGE TANK

AREA 1

● SB1

● SB2

EXPLANATION

● SOIL BORING
  LOCATION

0        15        30

SCALE IN FEET

| | | | |
|---|---|---|---|
| Khol<br>Drawn By | SLS<br>Approved By | 1051 01<br>Project # | 11/1/01<br>Date |

Figure 3.     Site plan map of investigated Area 1.

HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.
ENVIRONMENTAL CONSULTANTS
154 N. Savanne Drive
Scott, LA 70583
(318) 261-1963

6

and removed from the open borehole. A shelby tube sampler was inserted into the created borehole and driven to the prescribed depth. Soil samples collected were properly containerized, labeled, chilled and transported to Southern Petroleum Laboratories, Inc. in Lafayette, Louisiana for analysis of Total Petroleum Hydrocarbons (TPH) - Diesel by the Modified California Board of Health Services Method.   Laboratory analysis and chain of custody records of soil samples collected are contained in Appendix B.

Proper decontamination procedures utilized isopropyl alcohol and deionized water were conducted prior to and between sample collection.

Laboratory analysis indicates that soil samples collected from soil borings SB1 and SB2 at depths of 5 to 6 feet and 11 to 12 feet below land surface contained TPH diesel concentrations that are below the practical quantification limit of 3.3 milligrams per kilograms (mg/kg) (Appendix B).

Area 2

The portion of the property investigated in the vicinity of Johnston Street and the Eight Street intersection was designated as Area 2.  This area of the property formerly contained the two (2) above ground 12,500 gallon diesel fuel storage tanks. Information received from Mr. Harvey Mouhart indicated that the tanks contained diesel fuel and were approximately located along the property boundary and in the vicinity of the southeast corner of the property (Figure 2).

On October 8, 1991, HET installed two soil borings (SB1 and SB2) to determine if the contents from the former above ground storage tanks had impacted site soil conditions (Figure 4).  The soil borings were installed to depths of five feet below land surface by hand auger methods.  During the installation of these soil borings, soil samples were collected at composite depths of one to two feet and four to five feet below land surface   Complete geologic logs of all soil borings installed in Area 2 are contained in Appendix A. The soil samples were collected by shelby tube methods once the created borehole had reached the predetermined depth.  Once bucket augers were drilled to the predetermined depth and removed from the created borehole, the shelby tube sampler was inserted and driven to the prescribed depths.  Soil samples collected were properly containerized, labeled, chilled and transported to Southern Petroleum Laboratories for analysis of TPH - diesel by the Modified California Board of Health Service Method.  Laboratory analysis



Figure 4.     Site plan map of investigated Area 2.

HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.
ENVIRONMENTAL CONSULTANTS
104 N. Seventon Drive
Scott, LA 70563
(318) 261-1943

8

and chain of custody records are contained in Appendix B.

Bucket auger and shelby tube sampling equipment was decontaminated with isopropyl alcohol and deionized water prior to and between soil sample collection.

Laboratory analysis indicates that the soil samples collected during the installation of soil borings SB1 and SB2, at composite depths of one to two feet and four to five feet below land surface, contain TPH-diesel concentrations below the practical quantification limits of 3.3 mg/kg (Appendix B).

Area 3

The central portion of the property that formerly contained the oil storage houses was designated as Area 3 (Figure 2). This area is located in the central portion of the property approximately 140 feet east-northeast of the present Southern Pacific Transportation Company railroad tracks. The approximate outline of the former oil storage houses was provided by Fenstermaker personnel on October 21, 1991.

On October 21, 1991, HET investigated the outline former areas of the oil storage houses by collecting soil samples in grid fashion across the area. The oil storage houses were separated into two areas for the purposes of sample collection. Nine (9) soil samples (SS1A - SS1I) were collected to formulate the composite soil sample SS1 from the eastern portion of the oil storage house (Figure 5). The soil samples were collected with a shelby tube sampler and from a composite depth of land surface to ten inches below land surface (Figure 5). Six (6) soil samples (SS2A-SS2F) were installed to formulate the composite soil sample SS2 in the western portion of the oil storage houses. These soil samples were collected utilizing shelby tube methods and collected from composite depths of land surface to ten inches below land surface.

Soil samples collected were composited on-site to formulate the representative soil sample for each area. These soil samples (SS1 and SS2) were transported to the EFEH and Associates Laboratory in Houston, Texas for the Toxicity Characteristic Leaching Procedure (TCLP) analysis of regulated organic and inorganic parameter and a Hazardous Waste Characterization (HWC) analysis. These analysis determine if soil conditions are considered a hazardous waste. Laboratory analysis and chain of custody records are contained in Appendix B.



Figure 5.    Site plan map of investigated Area 3.

HYDRO-ENVIRONMENTAL TECHNOLOGY, INC.
ENVIRONMENTAL CONSULTANTS
184 N. Bayonne Drive
Boca, LA 70583
(318) 261-1963

DRAFT

10

Soil sample SS1 contained a Ph of 7.1, an oil and grease concentration of 260 part per million (ppm), and no TCLP organic or inorganic parameters above the regulatory limits. Soil sample SS2 contained a Ph 7.0, an oil and grease concentration of 160 ppm and no TCLP organic or inorganic parameters above the regulatory limits.

Area 4

The area investigated in the northern portion of the property was designated as Area 4 (Figure 2). This area of the site is located along Chestnut Street and contains a concrete slab and associated catch basin and discharge piping. Little information was obtained on this portion of the property. Information received indicated that this concrete slab was once utilized as a foundation for a lumber building. However, the use of the catch basin and associated piping as well as and contaminated curbing around the slab was not determined.

The investigation in Area 4 was directed toward the catch basin and associated discharge lines. The catch basin is located in the western most portion of the slab and is approximately one square foot in size and approximately two feet in depth. This catch basin seems to have a concrete bottom. A five inch metal line was observed leading from this basin and heading in a western direction (Figure 6). This metal line discharges into a one foot square wooden encased drain. This wooden drainage conduit is approximately two and half feet below land surface. At the discharge point the drain turns 90 degrees and heads in a northerly direction toward Chestnut Street (Figure 6). Two (2) selected areas of the wooden drain were excavated to obtain soil samples. This drainage system appears to have a native soil base.

On October 24, 1991, HET collected soil samples (SS1 and SS2) at two positions along this drain (Figure 6). Soil sample SS1 was collected at the immediate discharge point from the catch basin (Figure 6). Soil sample SS2 was collected in the portion of the drain along Chestnut Street (Figure 6). These soil samples were collected utilizing shelby tube methods and collected at a composite depth from drain base surface to one foot below drain base surface. These soil samples were properly containerized, labeled, chilled and transported to EFEH and Associates Laboratory in Houston, Texas for TCLP and HWC analysis as well as analysis of TPH by EPA Method 418.10, Volatile Organic Constituents by EPA Method



Figure 6.     Site plan map of investigated Area 4.

12

8240 and Base Neutral/Acid extractable compounds by EPA Method 8270. Complete Laboratory analysis and chain of custody records are contained in Appendix B.

Additionally, on October 24, 1991, HET installed two soil boring (SB1 and SB2) for purposes of collecting soil samples below the apparent bottom of the drain. Soil borings were installed to depths of two feet below the bottom of drain base in the same vicinity as soil samples SS1 and SS2 (Figure 6). Soil samples were collected at composite depths of two to two and a half feet below the base of the drain during the installation of soil boring SB1 and SB2.

Soil samples were collected when bucket augers had been drilled to predetermined depths and removed from the open borehole. A shelby tube sampler was inserted in the created borehole and driven to the prescribed depth. Soil samples collected were properly containerized, labeled and transported to Southern Petroleum Laboratories in Lafayette, Louisiana for analysis of TPH by EPA Method 418.10. The soil sample collected during the installation of soil boring SB2 was also analyzed for benzene, ethylbenzene, toluene and xylene by EPA Method 602. Laboratory analysis and chain of custody records for soil samples analyzed are contained in Appendix B.

Decontamination of sampling equipment and hand augers was conducted with isopropyl alcohol and deionized water prior to and between each soil sample collected.

Laboratory analysis indicates that soil sample SS1 contained a pH of 5.8, an oil and grease concentration of less than 0.01 ppm, a TPH concentration of 107.10 mg/kg and no TCLP organic or inorganic above regulatory limits. However, this sample did contain several Volatile organic parameters such as: Methylene chloride 22.0 micrograms per liter (ug/l), Bromochloromethane 35.0 ug/l, Benzene 59.0 ug/l, Trichloromethane 25.0 ug/l, 1,2-Dichlorobenzene 28 ug/l and 1,2-Dichloroethane 26.0 ug/l among others detected in this sample (Appendix B).

Laboratory analysis indicated that soil sample SS2 contained a pH 5.2, an oil and grease concentration 20.00 ppm, a TPH concentration of 39.0 mg/kg and no TCLP organic and inorganic parameters above the regulatory limits. However, several volatile organic parameters were detected in this sample. Parameters such as Methylene Chloride 6.0 ug/l, Bromochloromethane 35.0 ug/l, Benzene 27.0

13

ug/l and toluene 6 0 ug/l among others were detected in this sample (Appendix B.)

The soil samples collected during the installation of soil borings SB1 and SB2 at depths of two to two and a half feet below the base of the drain contained TPH concentrations of 58.0 mg/kg and 11.0 mg/kg, respectively. Additionally, the soil sample collected from soil boring SB2 contained a benzene concentration of 1.4 micrograms per kilograms (ug/kg) and a xylene concentration of 1.1 ug/kg.

## CONCLUSIONS

Data collected during this Phase II Investigation at the Southern Pacific Transportation Property indicates soil contamination is present in selected areas of the site.  Soil contamination at this site is below the regulatory limits for hazardous waste consideration and should be classified as an industrial solid waste.

Laboratory analysis indicates that the soil samples collected in the areas in which the former above ground and underground diesel fuel storage tanks were located, have TPH-diesel concentrations below the practical quantification limits.

Composite soil samples collected in the vicinity of the former oil storage houses indicate that no TCLP organic or inorganic parameters were detected above the regulatory limits. However, the oil and grease concentrations in these samples could indicate possible contamination.

The soil samples collected in the wooden drain area along the northern portion of the property contained the highest amounts of soil contamination.  While soil samples in this area contain no TCLP organic or inorganic parameters above regulatory limits, these soil samples contain total petroleum hydrocarbon concentrations and varying concentrations of numerous volatile organic constituent parameters.

This report is based on laboratory and field data collected on October 8, 10, 21 and 24, 1991 and information received from the client, representatives of the client and other responsible parties.  All conclusions are based on available information cited herein, and should be reviewed within this context. Should conditions at the site in question change, or additional information become available, especially with regard to prior site conditions, it may be necessary to modify these conditions and recommendations accordingly in the future.

14

## RECOMMENDATIONS

Based on laboratory analysis, soil contamination is present in selected portions of this site.  In order to comply with the Louisiana Department of Environmental Quality Regulations, the following recommendations are offered:

1.      Determine through the Louisiana Department of Environmental Quality directives and personnel, if the oil and grease concentrations detected in the vicinity of the oil storage houses (Area 3) are above State action levels.

2.      Formulate a site closure plan to remediate soil contamination along the length of the former wooden underground drain system in the northern portion of the property (Area 4). This plan should be submitted and approved by the Louisiana Department of Environmental Quality prior to implementation.  The site closure plan should address the following:

        a.  Soil Remediation Techniques
        b.  Soil Disposal Options
        c.  Extent of Soil Contamination
        d.  Confirmation Sampling

15

# APPENDIX A

## GEOLOGIC LOGS

## GEOLOGICAL BORING LOG

| BORING | PROJECT | PROJECT # | LOCATION | | DATE |
|---|---|---|---|---|---|
| SB1 - AREA 1 | CITY OF LAFAYETTE | 1051.01 | LAFAYETTE, LA | | 10/11/91 |

| TOTAL DEPTH | BOREHOLE DIAMETER | SCREEN DIAMETER, SLOT SIZE & LENGTH | CASING DIAMETER & LENGTH | MATERIAL |
|---|---|---|---|---|
| 12 FEET | 3 INCHES | N/A | N/A | N/A |

| DRILLER | ELEVATION | STATIC H$_2$O LEVEL |
|---|---|---|
| KEITH MONTERO HYDRO-ENVIRONMENTAL TECHNOLOGY, INC. | ≈ 25 FEET | N/A |

| DEPTH BELOW LAND SURFACE (FEET) | LITHOLOGIC DESCRIPTION | NUMBER OF SAMPLES | COMMENTS |
|---|---|---|---|
| 0 - 1 | CLAY - BACKFILL MATERIALS, BRICK, GRAVEL. | | DENSE. |
| 1 - 5 | SAND - TAN TO RUST, FINE GRAINED, WELL SORTED, LOW MOISTURE CONTENT. | ▪▪▪ | SHELBY TUBE @ 5 FEET. |
| 5 - 8 | SAND - BROWN TO RUST, FINE GRAINED, WELL SORTED, SOME MINOR CLAY CONTENT. | | |
| 8 - 12 | CLAY - BROWN TO DARK BROWN, FIRM, LOW MOISTURE CONTENT, MODERATED DENSITY. | ▪▪▪ | SHELBY TUBE @ 12 FEET. |
| | | | |
| | | | |
| | | | |
| | | | |

ClerkConnect Document Viewer    Page 84 of 200

# GEOLOGICAL BORING LOG

| BORING | PROJECT | PROJECT # | LOCATION | DATE |
|---|---|---|---|---|
| SB1 - AREA 2 | CITY OF LAFAYETTE | 1051.01 | LAFAYETTE, LA | 10/08/91 |

| TOTAL DEPTH | BOREHOLE DIAMETER | SCREEN DIAMETER, SLOT SIZE & LENGTH | CASING DIAMETER & LENGTH | MATERIAL |
|---|---|---|---|---|
| 5 FEET | 3 INCHES | N/A | N/A | N/A |

| DRILLER | ELEVATION | STATIC H$_2$O LEVEL |
|---|---|---|
| KEITH MONTERO HYDRO-ENVIRONMENTAL TECHNOLOGY, INC. | ≈ 25 FEET | N/A |

| DEPTH BELOW LAND SURFACE (FEET) | LITHOLOGIC DESCRIPTION | NUMBER OF SAMPLES | COMMENTS |
|---|---|---|---|
| 0 - 0.6 | GRASS, TOPSOIL AND GRAVEL. | | |
| 0.6 - 2 | CLAY - BLACK, SILTY, MODERATE DENSITY, LOW MOISTURE CONTENT. | ■■■ | SHELBY TUBE @ 2 FEET. |
| 2 - 5 | CLAY - TAN TO BROWN TO RUST, FIRM, LOW MOISTURE, SILTY CONTENT. | ■■■ | SHELBY TUBE @ 5 FEET. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## GEOLOGICAL BORING LOG

| BORING | PROJECT | PROJECT # | LOCATION | DATE |
|---|---|---|---|---|
| SB2 - AREA 1 | CITY OF LAFAYETTE | 1051.01 | LAFAYETTE, LA | 10/11/91 |

| TOTAL DEPTH | BOREHOLE DIAMETER | SCREEN DIAMETER, SLOT SIZE & LENGTH | CASING DIAMETER & LENGTH | MATERIAL |
|---|---|---|---|---|
| 12 FEET | 3 INCHES | N/A | N/A | N/A |

| DRILLER | ELEVATION | STATIC H$_2$O LEVEL |
|---|---|---|
| KEITH MONTERO HYDRO-ENVIRONMENTAL TECHNOLOGY, INC. | ≈ 25 FEET | N/A |

| DEPTH BELOW LAND SURFACE (FEET) | LITHOLOGIC DESCRIPTION | NUMBER OF SAMPLES | COMMENTS |
|---|---|---|---|
| 0 - 1 | CLAY - BACKFILL MATERIALS, BRICK, GRAVEL. | | DENSE. |
| 1 - 5 | SAND - TAN TO RUST, FINE GRAINED, WELL SORTED, LOW MOISTURE CONTENT. | ▪▪▪ | SHELBY TUBE @ 5 FEET. |
| 5 - 8 | SAND - BROWN TO RUST, FINE GRAINED, WELL SORTED, SOME MINOR CLAY CONTENT. | | |
| 8 - 12 | CLAY - BROWN TO DARK BROWN, FIRM, LOW MOISTURE CONTENT, MODERATED DENSITY. | ▪▪▪ | SHELBY TUBE @ 12 FEET. |
| | | | |
| | | | |
| | | | |
| | | | |

## GEOLOGICAL BORING LOG

| BORING | PROJECT | PROJECT # | LOCATION | DATE |
|---|---|---|---|---|
| SB2 - AREA 2 | CITY OF LAFAYETTE | 1051.01 | LAFAYETTE, LA | 10/08/91 |

| TOTAL DEPTH | BOREHOLE DIAMETER | SCREEN DIAMETER, SLOT SIZE & LENGTH | CASING DIAMETER & LENGTH | MATERIAL |
|---|---|---|---|---|
| 5 FEET | 3 INCHES | N/A | N/A | N/A |

| DRILLER | ELEVATION | STATIC H$_2$O LEVEL |
|---|---|---|
| KEITH MONTERO HYDRO-ENVIRONMENTAL TECHNOLOGY, INC. | ≈ 25 FEET | N/A |

| DEPTH BELOW LAND SURFACE (FEET) | LITHOLOGIC DESCRIPTION | NUMBER OF SAMPLES | COMMENTS |
|---|---|---|---|
| 0 - 0.6 | GRASS, TOPSOIL AND GRAVEL. | | |
| 0.6 - 2 | CLAY - BLACK, SILTY, MODERATE DENSITY, LOW MOISTURE CONTENT. | ▄▄▄ | SHELBY TUBE @ 2 FEET. |
| 2 - 5 | CLAY - TAN TO BROWN TO RUST, FIRM, LOW MOISTURE, SILTY CONTENT. | ▄▄▄ | SHELBY TUBE @ 5 FEET. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

20

**APPENDIX B**

**LABORATORY ANALYSIS**



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 31780
78? 70593 1780
PHONE  318 961 7374

## Certificate of Analysis No.    X1014005

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104R SAVONNE DR.
SCOTT, LA  70583

SMOKEY STOVER                                        10-25-91

| | |
|---|---|
| Project No: | 1051-01 |
| Project: | CITY OF LAFAYETTE |
| Site: | LAFAYETTE, LA |
| Sample No: | SB1 AREA #1 |
| Sample of: | SOIL |
| Sampled by: | HYDRO ENVIRONMENTAL TECHNOLOGY, INC. |
| Sample Date: | 10-11-91, 06:30 PM |
| Date Received: | 10-12-91 |

### A N A L Y T I C A L     R E S U L T S

| PARAMETER | RESULTS | MDL* |
|---|---|---|
| Total Petroleum Hydrocarbons<br>Method-Modified California DHS<br>HIGH BOILER FRACTION    - DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH  ANALYZED BY  : T. SUN        DATE/TIME: 10-15-91, 07:40 AM
TPH  EXTRACTED BY : S. WOOD       DATE/TIME: 10-14-91, 11:00 AM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated

C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 31780
(ZIP 70593 1780)
PHONE  318 984 2374

### Certificate of Analysis No.    X1014006

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104R SAVONNE DR.
SCOTT, LA  70583

SMOKEY STOVER                                      10-25-91

| | |
|---|---|
| Project No: | 1051-01 |
| Project: | CITY OF LAFAYETTE |
| Site: | LAFAYETTE, LA |
| Sample No: | SB2 AREA #1 |
| Sample of: | SOIL |
| Sampled by: | HYDRO ENVIRONMENTAL TECHNOLOGY, INC. |
| Sample Date: | 10-11-91, 06:45 PM |
| Date Received: | 10-12-91 |

## A N A L Y T I C A L   R E S U L T S

| PARAMETER | RESULTS | MDL* |
|---|---|---|
| Total Petroleum Hydrocarbons<br>Method-Modified California DHS<br>HIGH BOILER FRACTION    - DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH  ANALYZED BY  : T. SUN        DATE/TIME: 10-15-91, 08:37 AM
TPH  EXTRACTED BY : S. WOOD       DATE/TIME: 10-14-91, 11:00 AM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated


C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC

LAFAYETTE
P.O. BOX 31780
70° 70503 1780
PHONE  318 984 2374

Certificate of Analysis No.    X1014007

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104R SAVONNE DR.
SCOTT, LA  70583

SMOKEY STOVER                                    10-25-91

Project No:          1051-01
Project:             CITY OF LAFAYETTE
Site:                LAFAYETTE, LA
Sample No:           SB2 AREA #1
Sample of:           SOIL
Sampled by:          HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
Sample Date:         10-11-91, 07:00 PM
Date Received:       10-12-91

A N A L Y T I C A L    R E S U L T S

| PARAMETER | RESULTS | MDL* |
|-----------|---------|------|
| Total Petroleum Hydrocarbons | ND  mg/kg | 3.3  mg/kg |
| Method-Modified California DHS | | |
| HIGH BOILER FRACTION   - DIESEL | | |

TPH   ANALYZED BY : T. SUN        DATE/TIME: 10-15-91, 09:39 AM
TPH   EXTRACTED BY : S. WOOD       DATE/TIME: 10-14-91, 11:00 AM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated

C. A. Guardia

**SPL** SPL Environmental Laboratories, Inc.

**Analysis Request and Chain of Custody Record**

104 Guilbeau Road
Lafayette, Louisiana 70506
(318) 984-2314

Client/Project Name: *City of Lafayette*

Sample submitted by: *Keith McIntire (HET)*

Company: *Hydro Environmental Tech*

Address: *104N Savanne - Scott, LA*

Contact: *SMOKEY STOVER*   Phone: *261-1963*

Project Location: *Lafayette*

Project No.: *1051-01*

| Field Sample No./Identification | Date and Time | E/C/O | Sample Container (Size etc') | Sample Type (Liquid, Soil Sludge Etc) | Preservative | ANALYSIS REQUESTED | | REMARKS SW TS 10-17-91 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | TEST | METHOD | |
| 61 sa #1 | 10-11-91 18:30 | | (U) 150ml glass | 50 | | TPH - Diesel | Cal Mod Oth MS DHS | 11' - 12' |
| 62 sa #1 | 10-11-91 18:45 | | ii | ii | | ii | | 5' - 6' |
| 62 sa #1 | 10-11-91 19:00 | | ii | ii | | ii | | 11' - 12' |
| | | | | | | | | SW TS |
| | | | | | | | | 10-11-91 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sampler's (Signature) | Relinquished by (Signature) 10-12-91 12:15 | Date: | Received by (Signature) | Date: Time: | Intact |
| | Relinquished by (Signature) Keith Morton | Date: 10-12-91 Time: 12:00 | Received by (Signature) | Date: Time: | Intact |
| Attention | Relinquished by (Signature) | Date: Time: | Received by (Signature) | Date: Time: | Intact |
| SPLER REMARKS | | | Received for laboratory (Signature) Carrether Date Relinquished | Date: Time: 12:30 | Laboratory No. |

LAFAYETTE
P O BOX 31780
ZIP 70593-1780
PHONE 318 984 3654

SPL CHEST #_____

SOUTHERN PETROLEUM LABORATORIES, INC.
ENVIRONMENTAL LABORATORY      DATE _10/11/91_

CLIENT CHEST: YES/NO          SAMPLE LOGIN CHECKLIST

                                                              YES        NO

1)  IS A CHAIN-OF CUSTODY FORM PRESENT:                       _____      _____
2)  IS THE COC PROPERLY COMPLETED:                            _____      _____
    IF NO, DESCRIBE WHAT IS INCOMPLETE:

    _____

    _____

3)  HAS CLIENT BEEN CONTACTED ABOUT INCOMPLETE COC:           _____      _____
4)  IS AIRBILL/PACKING LIST/BILL OF LADING ATTACHED
    TO SHIPMENT:                                              _No_       _____
    IF YES, ID#_____

5)  ARE CUSTODY SEALS PRESENT ON THE PACKAGE:                 _____      _____
    IF YES, ARE THEY INTACT UPON RECEIPT:                     _____      _____

6)  ARE ALL SAMPLES TAGGED OR LABELED:                        _____      _____
    DO THE LABELS MATCH THE COC:                              _____      _____
    IF NO, HAS CLIENT BEEN CONTACTED ABOUT IT:                _____      _____
    (PLACE SUBSEQUENT DOCUMENTATION FROM CLIENT IN REMARKS)

7)  DO ALL SHIPPING DOCUMENTS AGREE:                          _Ab_       _____
    IF NO, DESCRIBE WHAT IS IN NONCONFORMITY:

    _____

    _____

8)  CONDITION/TEMPERATURE OF SHIPPING CONTAINER:

    _____ Ab — 10°C _____

9)  CONDITION OF SAMPLE CONTAINERS:

    _____ Ab _____

10) SAMPLE DISPOSAL:      SPL _____      RETURN TO CLIENT _____
REMARKS/CONTACT/PHONE/DATE:

    _____

    _____

    _____

CO.: _AES_          REPTS TO: _HES_      INV.TO: _HES_

PROJ #: _1051-01_   ATTN:_____   ATTN:_____

PROJ LOC.: _City of ZY_  ADDR:_____  ADDR:_____

SPL REP.:_____   CTY/ST_____  CTY/ST_____

P O BOX 31780          1000 INDUSTRIAL BLVD SUITE F      429 HUGHES DR      P O BOX 548



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P O BOX 31730
ZIP 70593 1730
PHONE  318 984 3374

## Certificate of Analysis No.    X1009630

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104A SAVONNE
LAFAYETTE, LA  70593

SMOKEY STOVER                                        10-14-91

| | |
|---|---|
| Project No: | 1051.01 |
| Project: | CITY OF LAFAYETTE |
| Site: | LAFAYETTE, LA |
| Sample No: | SB1 AREA #2  1'-2' |
| Sample of: | SOIL |
| Sampled by: | H.E.T. |
| Sample Date: | 10-08-91, 03:50 PM |
| Date Received: | 10-08-91 |

### A N A L Y T I C A L   R E S U L T S

| PARAMETER | RESULTS | MDL^ |
|---|---|---|
| Total Petroleum Hydrocarbons<br>Method-Modified California DHS<br>HIGH BOILER FRACTION  ~ DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH  ANALYZED BY  : D. CORMIER     DATE/TIME: 10-10-91, 04:39 AM
TPH  EXTRACTED BY : S. WOOD        DATE/TIME: 10-09-91, 01:00 PM

Notes:  ^ Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated

C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P O BOX 51780
ZIP 70503-1780
PHONE  318-984-2374

Certificate of Analysis No.     X1009631

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104A SAVONNE
LAFAYETTE, LA  70593

SMOKEY STOVER                                          10-14-91

| | |
|---|---|
| Project No: | 1051.01 |
| Project: | CITY OF LAFAYETTE |
| Site: | LAFAYETTE, LA |
| Sample No: | SB1 AREA #2  4'-5' |
| Sample of: | SOIL |
| Sampled by: | H.E.T. |
| Sample Date: | 10-08-91, 03:55 PM |
| Date Received: | 10-08-91 |

A N A L Y T I C A L   R E S U L T S

| PARAMETER | RESULTS | MDL* |
|---|---|---|
| Total Petroleum Hydrocarbons<br>Method-Modified California DHS<br>HIGH BOILER FRACTION   - DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH  ANALYZED BY : D. CORMIER      DATE/TIME: 10-10-91, 05:36 AM
TPH  EXTRACTED BY : S. WOOD        DATE/TIME: 10-09-91, 01:00 PM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:   This analysis was performed in accordance with EPA
                     guidelines for analysis and quality control.

SPL, Incorporated

C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 31780
ZIP 70593 1780
PHONE 318 984 2374

Certificate of Analysis No.     X1009632

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104A SAVONNE
LAFAYETTE, LA  70593

SMOKEY STOVER                                              10-14-91

| Project No: | 1051.01 |
|---|---|
| Project: | CITY OF LAFAYETTE |
| Site: | LAFAYETTE, LA |
| Sample No: | SB2 AREA #2  1'-2' |
| Sample of: | SOIL |
| Sampled by: | H.E.T. |
| Sample Date: | 10-08-91, 04:05 PM |
| Date Received: | 10-08-91 |

### A N A L Y T I C A L   R E S U L T S

| PARAMETER | RESULTS | MDL* |
|---|---|---|
| Total Petroleum Hydrocarbons Method-Modified California DHS HIGH BOILER FRACTION  - DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH   ANALYZED BY : D. CORMIER      DATE/TIME: 10-10-91, 06:34 AM
TPH   EXTRACTED BY : S. WOOD         DATE/TIME: 210-09-91, 01:00 PM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated

_C. A. Guardia_
C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 31780
ZIP 70593-1780
PHONE 318 984 2374

Certificate of Analysis No.    X01009633

HYDRO ENVIRONMENTAL TECHNOLOGY, INC.
104A SAVONNE
LAFAYETTE, LA  70593

SMOKEY STOVER                                          10-14-91

Project No:          1051.01
Project:             CITY OF LAFAYETTE
Site:                LAFAYETTE, LA
Sample No:           SB2  AREA#2  4'-5'
Sample of:           SOIL
Sampled by:          H.E.T.
Sample Date:         10-08-91, 04:20 PM
Date Received:       10-08-91

A N A L Y T I C A L   R E S U L T S

| PARAMETER | RESULTS | MDL* |
|-----------|---------|------|
| Total Petroleum Hydrocarbons Method-Modified California DHS HIGH BOILER FRACTION  - DIESEL | ND  mg/kg | 3.3  mg/kg |

TPH  ANALYZED BY  : D. CORMIER      DATE/TIME: 10-10-91, 07:30 AM
TPH  EXTRACTED BY : S. WOOD         DATE/TIME: 10-09-91, 01:00 PM

Notes:  * Method Detection Limit  ND = Not Detected.  NA = Not Analyzed.

QUALITY ASSURANCE:  This analysis was performed in accordance with EPA
                    guidelines for analysis and quality control.

SPL, Incorporated

C. A. Guardia



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 31780
DP 70593-1780
PHONE 318 984 3374

## ** SPL QUALITY CONTROL REPORT **

Matrix:  SOIL

Reported on:   10-14-91
Analyzed on:   10-10-91
Analyst:       D. CORMIER

This sample was randomly selected for use in the SPL quality control
program.  Samples chosen are fortified with a known concentration
in duplicate.  The results are as follows:

### TOTAL PETROLEUM HYDROCARBONS [TPH]
Method-Modified California DHS

---- SPIKE ANALYSIS ----

| SPL Sample ID | Blank Value mg/kg | Spike Added mg/kg | Original Sample Concentration mg/kg | MS Concentration mg/kg | MS % Rec # |
|---------------|-------------------|-------------------|-------------------------------------|------------------------|------------|
| X1009633      | ND                | 33.00             | ND                                  | 28.00                  | 84         |

---- SPIKE DUPLICATE ANALYSIS ----

| SPL Sample ID | Spike Added mg/kg | MSD Concentration mg/kg | MSD % Rec # | % RPD # |
|---------------|-------------------|-------------------------|-------------|---------|
| X1009633      | 33.00             | 30.00                   | 90          | 6.9     |

SPL, Incorporated

John Durand

John Durand, QC Officer

P.O. BOX 3802          P.O. BOX 31780          MOD. CALIFORNIA DHS 2.3.1.5          620 MICHILE DR          P.O. BOX 503



SOUTHERN PETROLEUM LABORATORIES, INC.

LAFAYETTE
P.O. BOX 51780
70505 1780
PHONE  318 984 7374

## ** SPL QUALITY CONTROL REPORT **

Matrix:  SOIL

Reported on:   10-16-91
Analyzed on:   10-15-91
Analyst:       T. SUN

This sample was randomly selected for use in the SPL quality control
program.  Samples chosen are fortified with a known concentration
in duplicate.  The results are as follows:

TOTAL PETROLEUM HYDROCARBONS [TPH]
Method-Modified California DHS

---- SPIKE ANALYSIS ----

| SPL Sample ID | Blank Value mg/kg | Spike Added mg/kg | Original Sample Concentration mg/kg | MS Concentration mg/kg | MS % Rec # |
|---|---|---|---|---|---|
| X1010650 | ND | 50.00 | ND | 49.00 | 98 |

---- SPIKE DUPLICATE ANALYSIS ----

| SPL Sample ID | Spike Added mg/kg | MSD Concentration mg/kg | MSD % Rec # | % RPD # |
|---|---|---|---|---|
| X1010650 | 50.00 | 41.20 | 82 | 17.3 |

SPL, Incorporated

*John Durand*

John Durand, QC Officer

P.O. BOX 2827        P.O. BOX 51780        1000 BAYOU BLVD     459 HUGHES DR        P.O. BOX 540

**SPL** SPL Environmental Laboratories, Inc.

Analysis Request and Chain of Custody Record

Client/Project Name: City of Lafayette

Received/submitted by: Keith Montes (HET)

| Company: Hydro Environmental Tech | Address: 104A SAVONNE | Contact: SACKEY STOVER | Project Location: LAFAYETTE | Project No: 1051.01 |
| Phone: 261-1963 | | | | |

| Field Sample Identification | Date and Time | | | | Sample Container (Size/Mat.) | Sample Type (Liquid Soil Sludge Etc.) | Preservative | TEST | METHOD | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|
| SB1 REA #1 | 10-08-91 15:00 | | | | (1) 150 ml GLASS | SO | | TPH. Diesel | Mod D45 | 5'-6' |
| | | | | | | | | | SWTS | |
| SB1 REA#2 | 10-08-91 15:50 | | | | " | " | | " | 10-18-91 | 1'-2' |
| " | 10-08-91 15:55 | | | | " | SO | | " | | 4'-5' |
| SB2 REA#2 | 10-08-91 16:05 | | | | " | SO | | " | | 1'-2' |
| SB2 REA#2 | 10-08-91 11:20 | | | | " | SO | | TPH. Diesel | | 4'-5' |

| Sampler (Signature) | Relinquished by: (Signature) Keith Montes | Date 10-08-91 Time 5:15 | Received by: (Signature) | Date Time | Intact |
| | Relinquished by: (Signature) | Date Time | Received by: (Signature) | Date Time | Intact |
| Airbill | Relinquished by: (Signature) | Date Time | Received by: (Signature) | Date Time | Intact |
| SPL REMARKS | | | Received for laboratory: (Signature) Oscar Latiman | Date 10-9-91 Time 1715 | Laboratory No |
| | | | Data Results to: | | |

**SPL**

SOUTHERN PETROLEUM LABORATORIES, INC.
ENVIRONMENTAL LABORATORY

LAFAYETTE
P.O. BOX 31780
ZIP 70503-1780
PHONE 318 984 2374

SPL CHEST #_____                                          DATE ___ - 8

CLIENT CHEST: YES/NO          SAMPLE LOGIN CHECKLIST

|  |  | YES | NO |
|---|---|---|---|
| 1) | IS A CHAIN-OF CUSTODY FORM PRESENT: | ✓ | |
| 2) | IS THE COC PROPERLY COMPLETED: | | |
| | IF NO, DESCRIBE WHAT IS INCOMPLETE: | | |

_____

_____

| 3) | HAS CLIENT BEEN CONTACTED ABOUT INCOMPLETE COC: | | |
|---|---|---|---|
| 4) | IS AIRBILL/PACKING LIST/BILL OF LADING ATTACHED TO SHIPMENT: | | ✓ |
| | IF YES, ID# _____ | | |
| 5) | ARE CUSTODY SEALS PRESENT ON THE PACKAGE: | | ✓ |
| | IF YES, ARE THEY INTACT UPON RECEIPT: · | | |
| 6) | ARE ALL SAMPLES TAGGED OR LABELED: | | ✓ |
| | DO THE LABELS MATCH THE COC: | | |
| | IF NO, HAS CLIENT BEEN CONTACTED ABOUT IT: | | |
| | (PLACE SUBSEQUENT DOCUMENTATION FROM CLIENT IN REMARKS) | | |
| 7) | DO ALL SHIPPING DOCUMENTS AGREE: | | |
| | IF NO, DESCRIBE WHAT IS IN NONCONFORMITY: | | |

_____

_____

8)  CONDITION/TEMPERATURE OF SHIPPING CONTAINER:

_____ O.K. ( 4°C .

9)  CONDITION OF SAMPLE CONTAINERS:

_____ O.K

10)  SAMPLE DISPOSAL:      SPL _____      RETURN TO CLIENT _____
REMARKS/CONTACT/PHONE/DATE:

_____

_____

_____

CO.:  H.E.T.       REPTS TO:_____   INV.TO:_____

PROJ #: 1051.01    ATTN:_____   ATTN:_____

PROJ LOC.: LAFAYETTE LA ADDR:_____   ADDR:_____

SPL REP.:_____ CTY/ST_____   CTY/ST_____



**EFEH** & **ASSOCIATES**

10919 SAGEWIND DRIVE • HOUSTON, TEXAS 77089 • TELEPHONE (713) 484-3362

October 29, 1991

Mr. S. Stover
Hydro-Environmental Technology, Inc.
Environmental Consultants
P.O. Box 31203
Lafayette, LA  70593-1203

Dear Mr. Stover:

Following are the results of soil sample submitted to our laboratory
for analyses on October 25, 1991:

SITE:  Lafayette

SAMPLE I.D.                        AREA 3
                                   Sample ID# SS1
                                   10/21/91
                                   18:00-18:30

LAB NO.                            E-3406

Specific Gravity, g/cc            1.25
Oil & Grease, ppm                 260
Color                             Brown
Physical State                    Solids
Odor                              Weak
Layers                            Single
Ignitability, °F                  >200
  (Pensky Martens Closed Cup)
Corrosivity, (pH)                 7.1
Reactivity - S, mg/kg             No Reaction (<0.01)
Reactivity - CN, mg/kg            No Reaction (<0.01)

Total Solids (Dried Weight), %    94.63


              APPEARANCE AFTER TWO TO FOUR HOURS

Layers                            1
Solids, %                         100
Oil, %                            <0.1
Liquid, %                         <0.1


                                        Page 2

# EFEH & ASSOCIATES

Page 2

SAMPLE I.D.                          Sample ID#  SS1
                                     10/21/91
                                     18:00-18:30

LAB NO.                              E-3406

TCLP INORGANICS (Leachate)

| | |
|---|---|
| Arsenic, mg/l | <0.01 |
| Barium, mg/l | 2.44 |
| Cadmium, mg/l | <0.005 |
| Chromium, mg/l | 0.01 |
| Copper, mg/l | <0.01 |
| Lead, mg/l | <0.01 |
| Mercury, mg/l | <0.002 |
| Nickel, mg/l | <0.01 |
| Selenium, mg/l | <0.01 |
| Silver, mg/l | <0.01 |
| Zinc, mg/l | 0.06 |
| Thallium, mg/l | <0.06 |

TCLP ORGANICS

| | |
|---|---|
| Endrin | <0.005 |
| Lindane | <0.01 |
| Methoxychlor | <0.01 |
| Toxaphene | <0.01 |
| 2,4-D | <0.01 |
| 2,4,5-TP (Silvex) | <0.01 |
| Benzene | <0.01 |
| Carbon Tetrachloride | <0.01 |
| Chlordane | <0.01 |
| Chlorobenzene | <0.01 |
| Chloroform | <0.01 |
| o-Cresol | <0.01 |
| m-Cresol | <0.01 |
| p-Cresol | <0.01 |
| Cresol | <0.01 |
| 1,4-Dichlorobenzene | <0.01 |
| 1,2-Dichloroethane | <0.01 |
| 1,1-Dichloroethylene | <0.01 |
| 2,4-Dinitrotoluene | <0.01 |
| Heptachlor | <0.004 |
| Hexachlorobenzene | <0.01 |
| Hexachloro-1,3-butadiene | <0.01 |
| Hexachloroethane | <0.01 |
| Methyl Ethyl Ketone | <0.01 |
| Nitrobenzene | <0.01 |
| Pentachlorophenol | <0.01 |

# EFEH & ASSOCIATES

Page 3

SAMPLE I.D.                          Sample ID#  SS1
                                     10/21/91
                                     18:00-18:30

LAB NO.                              E-3406

    Pyridine                         <0.01
    Tetrachloroethylene              <0.01
    Trichloroethylene                <0.01
    2,4,5-Trichlorophenol            <0.01
    2,4,6-Trichlorophenol            <0.01
    Vinyl Chloride                   <0.01

NOTE:  Units expressed in mg/l, unless otherwise noted.

METHOD:  HWC - EPA SW-846
         TCLP INORGANICS (Leachate) - EPA 1311/7060/7080/7130/7190/
                                          7420/7471/7741/7760/7950/
                                          7210/7520/7841
         TCLP ORGANICS - EPA 8015/8020/8050/8080


Please contact me if you have any questions concerning these results.

Sincerely,

Edwin B. Smith, Jr. PhD