# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

Salvation Army, et al.                   Civil Action No. 6:16-CV-0347

versus                                   Judge S. Maurice Hicks

Union Pacific Railroad, Inc.,
et al.                                   Magistrate Judge Carol B. Whitehurst

## REPORT AND RECOMMENDATION

This matter is before the Court on: (1) a Motion for Leave to File Amended Complaint, filed by Plaintiffs, The Salvation Army ("Salvation Army"), Barry J. Sallinger ("Sallinger"), Cypress Street Properties, LLC ("Cypress"), Edward P. Mouton ("Mouton"), Wayne Gary ("Gary"), Gary's Grocery & Market, Inc. ("Gary's Grocery"), DE & FK LLC ("DE & FK") and Frank's House, LLC ("Frank's House") (collectively "Plaintiffs") (Doc. 45); (2) a Memorandum in Opposition, filed by Union Pacific Railroad Company ("Union Pacific") and Southern Pacific Motor Trucking Company ("Southern Pacific") (collectively "Defendants") (Doc. 48); and (3) Plaintiffs' Reply (Doc. 53). Oral argument was held on February 15, 2017, after which the motion was taken under advisement. For the following reasons, the undersigned recommends that Plaintiff's motion be granted.

## I. Background

On February 1, 2016, Plaintiffs Salvation Army, Sallinger, and Cypress filed a Petition for Damages in the 15th Judicial District Court, Parish of Lafayette, State of Louisiana, seeking damages, declaratory judgment and injunctive relief under Louisiana law asserting that contaminants from Defendants' property migrated onto Plaintiffs' land, polluting the Chicot Aquifer, which is the drinking water source for plaintiffs and the City of Lafayette. (Doc. 1-4 at pp. 1-17). In addition to Union Pacific and Southern Pacific, these plaintiffs also named Consolidated Companies, Inc. ("ConCo") as a defendant in the initial complaint.

On March 7, 2016, Plaintiffs filed a First Amended Petition for Damages in state court, adding as plaintiffs Mouton, Gary, Gary's Grocery, DE & FK and Frank's House. (Doc. 19-1 at ¶ 7). In the First Amended Petition for Damages, Plaintiffs allege that they own immovable property located in downtown Lafayette, Louisiana. The Salvation Army, a non-profit corporation with its principal place of business in Georgia, owns two separate tracts. (Doc. 19-1at ¶ 7). Sallinger a Louisiana citizen, owns one tract. (Doc. 19-1 at ¶ 7). Cypress, a limited liability company whose members are Louisiana citizens, also owns one tract. (Doc. 19-1 at ¶ 7). Mouton, a Louisiana citizen, owns four separate tracts. (Doc. 19-1 at ¶ 7). Gary, a Louisiana

citizen, and Gary's Grocery, a Louisiana corporation, own the same tract. (Doc. 19-1 at ¶ 7). DE & FK, a Louisiana limited liability company, owns two tracts. (Doc. 19-1 at ¶ 7). Frank's House, a Louisiana limited liability company, owns one tract. (Doc. 19-1 at ¶ 7).

All of Plaintiffs' immovable property is located in an area which is adjacent to an approximate 40-acre area consisting of the former Southern Pacific Company ("Southern Pacific") [Union Pacific's predecessor] and Southern Pacific Transportation Company's railroad yard, and the former ConCo Food Distributors site (collectively, the "Facility"). (Doc. 19-1 at ¶¶ 8, 19). The area designated as the Facility was part of an earlier federal lawsuit brought in 1998. *See Consol. Companies, Inc. v. Union Pac. R. Co. et al.* No. 98-1804 (W.D. La. filed on Sep. 21, 1998) ("*ConCo* action"). ConCo asserted claims therein under the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*, and the Louisiana Environmental Quality Act ("LEQA"), La R. S. 30:2001, *et al.* During the course of the proceedings, District Judge S. Maurice Hicks, Jr. determined that the 40-acre area constituted the Facility for purposes of evaluating ConCo's claims. (*ConCo* action,

Doc. 118).   The Fifth Circuit affirmed Judge Hicks' determination.   *Consol. Companies, Inc. v. Union Pac. R. Co.*, 499 F.3d 382, 386 (5th Cir. 2007).[1]

Operations at the Facility began in the early 1900s and included fueling, monitoring and maintaining train engines and cars. (Doc. 19-1 at ¶ 19).  In 1964, ConCo bought part of the Facility and installed an underground diesel storage system. (Doc. 19-1 at ¶¶ 20, 23).  Around the early 1960s, Southern Pacific subdivided and sold off certain parcels of the Facility to other entities. (Doc. 19-1 at ¶ 21).  ConCo sold its property in 2011.  (Doc. 19-1 at ¶ 20; Doc. 21 at p. 1).

At various times throughout the operations at the Facility, the equipment and works at the rail yard included a 35,000-barrel aboveground fuel oil tank; a 30,000-barrel above-ground fuel oil tank, a machine shop and roundhouse; multiple paint houses; multiple oil houses; multiple repair shops storing oil, fuel and dynamite; thousands of feet of railroad tracks, and numerous pipelines, wells and drains.  (Doc. 19-1 at ¶ 23).  Plaintiffs generally state that Defendants "owned, leased, or operated on the property described [as the Facility] and created and contributed to a

_____

[1]  In a state court lawsuit filed in 2003, neighboring Lafayette property owners filed a Petition for Damages, alleging that their land was contaminated by operations at the Facility. *JoAnn Gant Johnson and Annette B. Lewis v. Georgia Pacific Corporation, et al*, Docket No. 2003- 5863, 15th Judicial District Court, Parish of Lafayette, State of Louisiana (the "*Johnson* action"),

commingled plume of contamination that is damaging, has damaged, and otherwise adversely impacts the property interests of the Plaintiffs, and that is threatening the City of Lafayette's drinking water source, the Chicot Aquifer." (Doc. 19-1 at ¶ 14).

Beginning in the early 1990s, environmental testing conducted by Defendants revealed contaminated soil and groundwater beneath the Facility. (Doc. 19-1 at ¶ 25). Plaintiffs allege that Defendants failed to conduct a comprehensive cleanup and implement any protective or remedial measures to prevent migration of these contaminants in the direction of Plaintiffs' properties as well as into the Chicot Aquifer. (Doc. 19-1 at ¶¶ 26-28, 36). According to Plaintiffs, Defendants have failed to warn Plaintiffs of the risks associated with Defendants' acts and omissions. (Doc. 19-1 at ¶ 49). Thus, Plaintiffs assert that Defendants' operations have impacted and are threatening to further impact Plaintiffs' properties and the Chicot Aquifer. (Doc. 19-1 at ¶¶ 1, 31, 34).

Plaintiffs assert state law claims against Defendants under La. Civ. Code arts. 667-669 (servitude of neighborliness); 2315 (negligence and trespass); 2315.3 (punitive damages); and 2317 and 2322 (strict liability); 2317. 2317.1 and 2322 (strict liability); 2298 (unjust enrichment), and the Louisiana Groundwater Act, La. R. S.

30:2015.1.  (Doc. 19-1 at ¶¶ 52-89).  Plaintiffs seek declaratory, injunctive, and monetary relief.  (Doc. 19-1 at ¶ 91).

On March 14, 2016, Defendants removed this case on the basis of federal question jurisdiction under 28 U.S.C. § 1331, specifically, the RCRA., and diversity jurisdiction under 28 U.S.C. § 1332.  On March 21, 2016, Defendants filed a Motion to Dismiss, or in the Alternative, Motion for More Definite Statement ("Rule 12 Motions").  (Doc. 6).  Thereafter, on April 13, 2016, Plaintiff filed a Motion to Remand.  (Doc. 16).  That same day, the Court stayed all non-remand related proceedings.  (Doc. 18).

On June 23, 2016, the undersigned issued a Report and Recommendation ("R&R"), which recommended that Plaintiffs Motion to Remand be denied.  (Doc. 29.)  The undersigned found that, while there is no federal question jurisdiction, diversity jurisdiction existed.  (Doc. 29).  The undersigned further recommended the dismissal of ConCo without prejudice as improperly joined in this action.  (Doc. 29).  On October 4, 2016, District Judge S. Maurice Hicks adopted the R&R.  (Doc. 35).

Plaintiffs' Rule 12 motions were set for oral argument before the undersigned on December 21, 2016.  (Doc. 37).  However, on December 13, 2016, the undersigned cancelled oral argument, stating that the Court would issue a ruling on the Rule 12

6

motions based on the parties briefs. (Doc. 44). On December 19, 2016, Plaintiff filed their motion seeking leave to amend their complaint as follows: (1) adding citizen-suit enforcement claims under LEQA against Union Pacific and Southern Pacific; and (2) adding a LEQA claim as well as claims under La. Civ. Code arts. 667-669 and 2315 against a non-diverse party, CenturyLink Communications, LLC. ("CenturyLink").[2] (Doc. 45). Defendants oppose Plaintiff's motion. (Doc. 48).

In their proposed Second Supplemental and Amending Petition for Damages, Plaintiffs state that "[p]art of the Facility property was owned by CenturyLink and CenturyLink's predecessor-in-interest, [Qwest Communications Corp. ("Qwest")], during Plaintiffs' ownership of their property." (Doc. 45-3 at ¶ 22). Plaintiffs further state that CenturyLink currently own a .856-acre tract of land located at 320 South Chestnut Street, which is part of the Facility's property. (Doc. 45-3 at ¶ 24).

According to Plaintiffs, "Century Link has performed excavation and construction works on its piece of the Facility, contributing to the contamination of the Facility that is migrating to the Plaintiffs' properties as well as to the groundwater and Chicot Aquifer." (Doc. 45-3 at ¶ 28). Plaintiffs also allege that "CenturyLink

---

[2] On January 3, 2017, the undersigned denied Defendants' Rule 12 Motions without prejudice to re-urge after the Court rules on Plaintiffs' Motion for Leave to File Amended Complaint. (Doc. 47).

continues to perform works at its property that disturb the contaminated soils and also serve as a conduit for the further migration of contaminants." (Doc. 45-3 at ¶ 38). Plaintiff allege that they had no actual or constructive knowledge of the possible claims against CenturyLink until less than two months before the filing of this Second Supplemental and Amending Petition for Damages after being advised by counsel of the possibility of CenturyLink's contribution to the complained of environmental damage. (Doc. 45-3 at ¶ 10).

## II. Discussion

### A. Applicable Standard of Review

Typically, amendments to pleadings are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a) provides in pertinent part that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend generally should be granted absent some justification for refusal such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998). In other words, a motion for leave should not be denied

"unless there is a substantial reason to do so." *Leffall v. Dallas Independent School District*, 28 F.3d 521, 524 (5th Cir. 1994).

In removed cases pursuant to 28 U.S.C. § 1447(e), however, a district court has discretion to either grant or deny an amendment of a complaint when subject matter jurisdiction is based on diversity and the plaintiff seeks to amend the complaint by adding a non-diverse party. 28 U.S.C. § 1447(e); *Mitchell v. Wal-Mart Stores, Inc.*, No. 6:15-2506, 2016 WL 447721, at *2 (W.D. La. 2016). Thus, when faced with an amended pleading naming a non-diverse defendant in a removed case, federal courts should scrutinize that amendment more closely than an ordinary amendment. *Hensgens v. Deere & Co.*, 833 F.2d 1179, 1182 (5th Cir. 1987).[3] In such cases, resolving the question of whether to permit an amendment which will destroy the subject matter jurisdiction of this court, justice requires that the district court balance the diverse defendant's interest in retaining the federal forum with the competing interests. *Id.*

---

[3] Although *Hensgens* was decided before Congress passed 28 U.S.C. § 1447(e), the Fifth Circuit has cited *Hensgens* with approval subsequent to the passage of § 1447(e). *See Tillman v. CSX Transportation, Inc.*, 929 F.2d 1023, 1029 (5th Cir. 1991). Moreover, district courts in the Fifth Circuit have consistently held that the *Hensgens* approach remains good law. *See Schindler v. Charles Schwab & Co. Inc.*, No. A.05-0082, 2005 WL 1155862 at *2 n.3 (E.D. La. May 12, 2005) (and cases cited therein). Further, the parties each cite *Hensgens* as controlling the analysis of the resolution of this motion.

The Fifth Circuit Court of Appeals has concluded that balancing those interests would not be served by a "rigid distinction of whether the proposed added party is an indispensable or permissive party" pursuant to the Federal Rules of Civil Procedure. *Id*.; *See also Mitchell*, 2016 WL 447721, at *2. Instead, in *Hensgens*, the Fifth Circuit set forth four factors that district courts should consider when deciding whether to allow post-removal amendment and joinder of non-diverse defendants: (1) the extent to which the purpose of the amendment is to defeat federal jurisdiction; (2) whether plaintiff has been dilatory in asking for amendment; (3) whether plaintiff will be significantly injured if amendment is not allowed; and (4) any other factors bearing on the equities. *Hensgens*, 833 F.2d at 1182. The district court should then balance the equities and decide whether amendment should be permitted. *Id*. If amendment of a non-diverse defendant is permitted, the case must be remanded to the state court; if amendment is not allowed, the federal court maintains jurisdiction. *Id; see also* 28 U.S.C. § 1447(e).

**B.    *Plaintiffs' Motion for Leave to Amend Complaint and Defendants' Memorandum in Opposition***

Plaintiffs seek Court leave under Rule 15(a)(2) to grant their motion to amend with respect to their LEQA claims against Union Pacific and Southern Pacific. (Doc. 45-1 at pp. 7-9). Plaintiff's proposed LEQA claims are based on allegations that

these defendants have for decades "discharged and/or allowed the discharge of hazardous substances into soil and subsurface waters." (Doc. 45-1 at p. 8). Plaintiffs further contend that they have an interest in protecting their properties and drinking water from such toxic pollutants. (Doc. 45-1 at p. 8).

Plaintiffs further assert that they have stated a LEQA claim against CenturyLink. (Doc. 45-1 at pp. 9-11). Their proposed LEQA claim is based on allegations that: (1) CenturyLink is the owner of a contaminated tract of land that is part of the Facility; and (2) activities of CenturyLink on their property has "discharged and/or allowed the discharge of substances causing and tending to cause water pollution into the state's surface and ground waters both by its own construction activities on and near the Facility and by its failure to remediate the contamination after acquiring its tract." (Doc. 45-1 at pp. 9-10). Plaintiffs reiterate that they have an interest in protecting their properties and drinking water from toxic contaminants. (Doc. 45-1 at p. 11).

Plaintiffs assert that they have properly asserted a cause of action against CenturyLink under La. Civ. Code arts. 667-669 because "[t]he known contamination on CenturyLink's property also constitutes an ongoing nuisance, thereby depriving Plaintiffs of the full use and enjoyment of their properties." (Doc. 45-1 at p. 11). Plaintiffs also seek to add negligence and trespass claims under La. Civ. Code art.

11

2315 based on allegations that: (1) CenturyLink failed to protect Plaintiffs from the harmful effects of its contaminated property and to warn Plaintiffs of the contamination on its property; and (2) toxic and hazardous contamination have migrated unabatedly onto Plaintiffs' properties. (Doc. 45-1 at pp. 12-13).

Plaintiffs acknowledge that the Court must conduct a *Hensgens* analysis before granting Plaintiffs' leave to add the LEQA claims against CenturyLink.[4] First, Plaintiffs argue that the purpose of their amendment is not to defeat federal jurisdiction. (Doc. 45-1 at pp. 13-14). Rather, according to Plaintiffs, "the purpose in this litigation from the beginning has been to ensure that *all portions* of the facility are fully remediated so that Plaintiffs' properties and drinking water are well-protected." (Doc. 45-1 at p. 13). Plaintiffs assert that they have a legitimate and compelling reason to add CenturyLink based on their valid claims under LEQA and La. Civ. Code arts. 667-669 and 2315. (Doc. 45-1 at p. 14).

With regard to the second *Hensgens* factor, Plaintiffs contend that they have not been dilatory in seeking leave to file their amendment as the case is still in its early stages with no scheduling order entered. (Doc. 45-1 at pp. 14-15). Plaintiffs

---

[4] Curiously, Plaintiffs do not expressly assert that a *Hensgens* analysis is required with respect to seeking leave to add claims under La. Civ. Code arts. 667-669 and 2315. Plaintiffs nevertheless reference these claims when analyzing each of the *Hensgens* factors.

12

state they recently learned that CenturyLink not only owns a contaminated tract of the Facility but also has conducted activities likely to exacerbate the migration of contaminants towards Plaintiffs' properties and the Chicot Aquifer. (Doc. 45-1 at p. 14).

Plaintiffs contend, as to the third *Hensgens* factor, that they will be significantly injured if forced to choose between not pursing their claims against CenturyLink or instituting a parallel state proceeding against CenturyLink. (Doc. 45-1 at p. 15). Plaintiffs contend that "considerations of cost and efficiency– both for the parties and the courts involved– militate in favor of not requiring Plaintiffs to pursue their claims in different forums." (Doc. 45-1 at p. 16). Lastly, Plaintiffs contend that a "dual-forum scenario also creates a risk of prejudicial rulings being entered against Plaintiffs" in the form of inconsistent rulings on legal issues and the final resolution. (Doc. 45-1 at p. 16).

With regard to the fourth *Hensgens* factor, Plaintiffs reiterate their interest in avoiding parallel litigation. (Doc. 45-1 at pp. 16-17). Plaintiffs maintain that Defendants preference for a federal forum is not as compelling as the preference to litigate all claims against all parties in one state court forum. (Doc. 45 at p. 17). Accordingly, Plaintiffs assert that all four factors in the *Hensgens* analysis weigh in favor of allowing the amendment.

13

In their response, Defendants generally assert that Plaintiffs filed their motion to amend "to destroy diversity, to circumvent previous rulings by this Court and avoid exposing their claims to Rule 12 practice." (Doc. 48 at p. 7). Defendants contend that each *Hensgens* factor militates against Plaintiffs. (Doc. 48 at p. 12).

Defendants contend with regard to the first and second *Hensgens* factors that: (1) the ten-month plus delay between Plaintiffs' initiation of their suit and their attempt to join CenturyLink meets the test for an undue "length of time;" (2) an attempted joinder of a non-diverse party following removal but before discovery should be viewed suspiciously, especially where Plaintiff knew or should have known the identity of the non-diverse defendant at the time the lawsuit was originally filed; and (3) a motion to amend filed soon after Defendants filed their dispositive motion suggests an ulterior motive in avoiding adjudication of their claims under Rule 12. (Doc. 48 at pp. 12-17).

Defendants further contend that Plaintiffs' claims against CenturyLink are not valid since they are prescribed. (Doc. 48 at pp. 17-21). In citing the evidence attached to Plaintiff's proposed amendments, Defendants state that CenturyLink's alleged improper conduct occurred more than seventeen years ago and should, therefore, be prescribed for the same reasons that Plaintiffs' claims against ConCo were prescribed." (Doc. 48 at pp. 19-20). Defendants contend that Plaintiffs cannot

demonstrate the existence of "exceptional circumstances" to show that they could not have known of CenturyLink's alleged contamination until one year before filing suit. (Doc. 48 at p. 20). Defendants reference the undersigned's R&R, which concluded that Plaintiffs should have known about ConCo's activities on the basis that the petition stated that at least two prior lawsuits involving ConCo were filed in 1998 and 2003 pertaining to environmental damages allegedly resulting from the Facility's operation. (Doc. 48 at p. 20).

With regard to the third and fourth *Hensgens* factors, Defendants contend that Plaintiffs are not prejudiced because: (1) Plaintiffs have no reasonable possibility of recovery against CenturyLink; (2) any separate litigation against CenturyLink would not be parallel litigation with no possibility of inconsistent rulings; and (3) Plaintiff's injury is self-inflicted as they should have identified CenturyLink as potentially liable before filing their original petition. (Doc. 48 at pp. 21-22). Lastly, Defendants urge that equitable considerations do not favor remand. (Doc. 48 at pp. 22-23).

In reply, Plaintiffs reiterate that they state viable claims against CenturyLink and that adding such claims at this early stage in the proceedings will not prejudice Defendants. (Doc. 53 at pp. 1-2). Given the procedural timeline in this case and the fact they are diligently pursuing claims against all potentially responsible parties,

such as CenturyLink, Plaintiffs contend that they have not been dilatory. (Doc. 53 at pp. 2-3).

As to the validity of their claims against CenturyLink, Plaintiffs assert that such claims are not prescribed for the same reasons that their claims against Defendants are not prescribed. (Doc. 53 at pp. 4-6). Plaintiffs contend that: (1) in contrast to ConCo, CenturyLink currently owns and is still contributing to the contamination of the property; (2) Defendants cannot show that Plaintiffs could have or should have known about CenturyLink's contribution more than one year ago because "CenturyLink's contribution to the contamination has not been the subject of prior litigation, and Plaintiffs only recently obtained details of CenturyLink's liability through an expert investigation." (Doc. 53 at p. 5). Furthermore, according to Plaintiffs, their LEQA citizen suit is not subject to a one-year prescriptive period because the Louisiana Supreme Court has not ruled that the LEQA is subject to such a period. (Doc. 53 at pp. 5-6).

## C.    *Hensgens Analysis*

### (1)    *Is the purpose of the amendment to defeat federal jurisdiction?*

With respect to the first *Hensgens* factor, in analyzing whether the purpose of amendment is to destroy diversity, courts consider "whether the proposed amendment presents a valid cause of action." *Mitchell*, 2016 WL 447721, at *2 (citing *Tillman*,

16

929 F.2d at 1029). If the amendment presents a valid claim, "it is unlikely that the primary purpose of [the amendment] is to destroy diversity jurisdiction." *Mitchell*, 2016 WL 447721, at *2. Defendants contend that Plaintiffs' claims against CenturyLink are not valid claims because they are prescribed. (Doc. 48 at pp. 17-21). As discussed in detail below, however, the Court cannot conclude that Plaintiffs' new claims are prescribed based on the record before it.

With respect to Plaintiffs proposed state law tort, trespass, and vicinage claims against CenturyLink, Defendants assert that the applicable prescriptive period is found in La. Civ. Code art. 3493. (Doc. 48 at p. 18). Defendants further assert that Plaintiffs' LEQA citizen suit claims are also subject to the same one-year prescription applicable to tort claims. (Doc. 48 at p. 18). Civil Code Article 3493 provides as follows:

> When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable *acquired, or should have acquired,* knowledge of the damage.

La. Civ. Code art. 3493 (emphasis added). Once it is shown that more than a year has elapsed between the time of the actionable conduct and the filing of suit, the burden shifts to the plaintiff to prove either suspension, interruption, or some exception to prescription, using an exception such as contra non valentem. *Hernandez v. Smith*, No. 15-cv-2271, 2015 WL 9921067, at *2 (W.D. La. Sept. 28, 2015), *report and*

*recommendation adopted*, 2016 WL 356044 (W.D. La. Jan. 27, 2016) (*citing Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 320 (5th Cir. 2002)).

Defendants argue that Plaintiffs' claims against CenturyLink are prescribed for the same reasons the Court found Plaintiffs' claims against ConCo to be prescribed. (Doc. 48 at pp. 19-20).  In the R&R issued on June 23, 2016, the undersigned concluded that Plaintiffs' claims against ConCo were prescribed because Plaintiffs should have known about their alleged causes of action prior to the expiration of the prescriptive period.  (Doc. 29 at p. 18-20).  According to Defendants, CenturyLink's alleged conduct occurred no later than 1999, which is more than seventeen years before Plaintiffs now seek to file their proposed amendments.  (Doc. 48 at pp. 19-20).

A review of Plaintiffs' proposed amendments reflects that they seek to add allegations regarding not only CenturyLink's past conduct, which is linked to the overall contamination of the Facility, but also to present conduct on its property "that disturb the contaminated soils and also serve as a conduit for the further migration of contaminants."  (Doc. 45-3 at ¶ 38).  Plaintiffs attach "Exhibit L" to their proposed amendments to support this allegation of continuing violations committed by

18

CenturyLink.  Defendants counter that "Exhibit L" contradicts Plaintiffs' allegation of continuing violations and should, therefore, control.  (Doc. 48 at p. 19).[5]

"Exhibit L" is an October 16 ordinance of the Lafayette City-Parish that grants Century-Link a fiber optic cable right-of-way.  (Doc. 45-8).  The ordinance specifically establishes that: (1) "[p]rior to its installation, removal, relocation, or modification" of its cables, CenturyLink must "secure" a "site-specific permit" from Lafayette's Director of Public Works; and (2) the City-Parish "does not . . . guarantee" that such a permit is forthcoming.  (Doc.45-8 at p. 5).  While this ordinance precludes CenturyLink from engaging in certain underground activity without a permit, it does not necessarily contradict Plaintiffs' allegation that CenturyLink is presently conducting some type of activity, whether lawful or unlawful, that is disturbing the soil and causing contamination to migrate.[6]

---

[5] "If such an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegations control."  *U.S. ex rel. Riley v. St. Like's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

[6] During oral argument, counsel for Plaintiffs attempted to clarify that activity on CenturyLink's property with respect to the ordinance has not yet been conducted in the absence of a proper permit.  (Hearing Transcript at p. 31.)  Counsel, however, indicated that, due to the nature of the Facility, maintenance and inspection of the underground lines will undoubtedly need to take place.  At this time, the undersigned finds that Plaintiffs' allegations in the proposed amendments of CenturyLink's continuing activity on the property control.

Even if Plaintiff's allegations fail to state ongoing violations of state law sufficient to defeat prescription on their own, Defendants have failed to show that Plaintiffs could have or should have known of CenturyLink's contribution to the Facility's contamination more than one year ago. Plaintiffs cite a November 4, 2016 expert report prepared by R. Brent Bray of RBB Consulting, Inc. ("RBB Expert Report") for the proposition that it could not or should not have known of its claims against CenturyLink until after reviewing the report. (Hearing Transcript at p. 12). The RBB Expert Report discloses that CenturyLink purchased its property in the Facility in 1999 "<u>after</u> building a fiber optic relay station on the property." (Doc. 45-6 at p. 3) (emphasis in original). The report further discloses that CenturyLink's predecessor-in-interest Qwest

> has not implemented supplementary site investigations activities to define the horizontal and vertical extent of contamination or evaluate the extent to which building and underground construction affected soil and groundwater quality . . . . This delay in completing a regulatory approved soil and groundwater characterization has more likely than not resulted in the continued horizontal and vertical migration of contamination through soil and as contamination reached the saturated zones, through groundwater.

(Doc. 45-6 at p. 4)

The RBB Expert Report lends support to Plaintiffs' allegations in the proposed amendments that it did not know and could not have known of CenturyLinks'

20

potential liability until recently. Any comparisons between CenturyLink and ConCo, therefore, are misplaced for purposes of whether prescription applies. While ConCo sold off its allegedly contaminated piece of property in 2011, CenturyLink still owns a part of the Facility property and is considered a potentially responsible party ("PRP"). Furthermore, in contrast to ConCo, which was a named defendant in the 1998 *ConCo* action, CenturyLink was not a party in either the *Conco* action or the *Johnson* action filed in 2003. Defendants fail to convince the Court that Plaintiffs should have known about any possible claims against CenturyLink based on the notion that two prior actions involving the Facility, but not including CenturyLink, were previously litigated.[7]

Plaintiffs, therefore, state valid tort, vicinage, and LEQA claims against CenturyLink as Defendants cannot show at this time that each claim is barred by the one-year statute of limitations. Even if Defendants could demonstrate that Plaintiffs'

---

[7] During oral argument, the Court asked counsel for defendants why, if Plaintiffs' claims against CenturyLink are prescribed, would their claims against the current defendants would not be prescribed. (Hearing Transcript at p. 27.) Defendants counsel indicated that such prescription arguments against the current Defendants are more appropriately raised at the summary judgment stage as it involves matters outside the pleadings. (Hearing Transcript at pp. 28-29.) Likewise, given Plaintiffs' allegations stating valid claims against CenturyLink, any issues as to whether prescription applies to CenturyLink would also be best addressed on summary judgment.

tort and vicinage claims are prescribed, Defendants cannot establish at this time, as discussed below, that the proposed LEQA claims are similarly prescribed.

The parties disagree whether LEQA citizen suits pursuant to La. R.S. § 30:2026(A)(1) are subject to a one-year prescription period. "In diversity cases, federal courts apply state laws on limitations, including accrual, and tolling." *Alexander v. Nixon*, No. 15-2300, 2015 WL 9997250, at *2 (W.D. La. Dec. 15, 2015). Furthermore, "[t]o determine Louisiana Law, federal courts look to the final decisions of the Louisiana Supreme Court." *TDX Energy, LLC v. Chesapeake Operating, Inc.*, No. 13-1242, 2016 WL 1179206, at *4 (W.D. La. Mar. 24, 2016) (citing *Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009)). Federal courts must make an "*Erie* guess" where there is an absence of a decision by the Louisiana Supreme Court on a particular issue. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007). In making such a guess, the district court must use its best judgment to determine:

> how [the Louisiana Supreme C]ourt would resolve the issue if presented with the same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

22

*In re Katrina Canal Breaches Litigation*, 495 F.3d at 206 (internal citations and quotations omitted).

The Louisiana citizen suit statute provides in pertinent part that "any person having an interest, which is or may be adversely affected, may commence a civil action on his own behalf against any person whom he alleges to be in violation of this Subtitle or of the regulations promulgated hereunder."   La. R.S. § 30:2026(A)(1). The statute is silent with regard to setting forth a prescription period.    The Louisiana Supreme Court has neither adopted a prescription period for LEQA citizen suits nor otherwise analyzed the issue.

One Louisiana appellate court analogized the citizen suit cause of action under LEQA to a tort cause of action and concluded in *dicta* that the LEQA citizen suit claim would be prescribed under the one-year prescription period applicable to torts. *Morris & Dickson Co., Inc. v. Jones Brothers Co., Inc.*, 691 So. 2d 882, 895 (La. App. 2d Cir. 1997).  The Louisiana appellate court relied only on a law review article by Professor K. Murchison which "characterized the citizen suits provision of the Act as arguably creating a new tort." *Id.* (citing K. Murchison, "*Enforcing Environmental Standards Under State Law: The Louisiana Environmental Quality Act*," 57 La. L. Rev. 497, 555 (1997)).

23

While urging the Court to find that LEQA is subject to the one-year prescription period applicable to tort actions, Defendants acknowledge that the Louisiana appellate court's conclusion regarding a prescription period for LEQA claims is *dicta*. (Hearing Transcript at p. 22). The parties have not cited and this Court has not found any authority in either the Louisiana Supreme Court, the Louisiana constitution, or the states' statutes to support the principle that the LEQA statute has created a new tort and is subject to a one-year prescriptive period. Plaintiffs argue that citizen suits seeking to enforce regulations of the Department of Environmental Quality regulations, like Plaintiffs' proposed LEQA claims, are nothing like private tort claims because LEQA claims pertain to fundamentally-different public law matters. (Hearing Transcript at pp. 36-37). The Court is persuaded by Plaintiffs' argument. At this time, the Court's best *Erie* guess would be that the Louisiana Supreme Court would not find the one-year prescription period for tort actions applicable to LEQA citizen suits. Thus, at a minimum, Plaintiffs' proposed LEQA claim against CenturyLink is not prescribed.

In sum, Plaintiffs seeks to bring state law valid claims against CenturyLink which appear on their face not subject to prescription. The fact that Plaintiffs seek to bring valid new claims lends credence to the notion that such amendments are not brought to defeat diversity jurisdiction. Rather, Plaintiffs' desire to bring such valid

claims supports its stated purpose "to ensure that *all portions* of the facility are fully remediated so that Plaintiffs' properties and drinking water are well-protected." (*See* Doc. 45-1 at p. 13) . Accordingly, the undersigned find that the first *Hensgens* factor weighs in favor of Plaintiffs.

    2.    *Have Plaintiffs been dilatory in asking for their amendments?*

    In determining whether Plaintiffs have been dilatory in seeking their amendment, "district courts often look to the amount of time that has passed between the filing of the original complaint and the amendment and the amount of time between the removal and the amendment." *Schindler v. Charles Schwab & Co., Inc.*, No. A-05-0082, 2005 WL 1155862, at *4 (E.D. La. May 12, 2005) (citation omitted). "Generally a plaintiff is not dilatory in seeking to amend a complaint when no trial or pre-trial dates [have been] scheduled and no significant activity beyond the pleading stage has occurred." *Boyce v. CitiMortgage, Inc.*, 992 F. Supp. 2d 709, 720 (W.D. Tex. 2014) (quotation and citation omitted).  However, "the analysis is different when the proposed amendment is to add nondiverse defendants shortly after removal based on federal diversity jurisdiction." *Gallegos v. Safeco Ins. Co. of Indiana*, No. H-09-2977, 2009 WL 4730570, at *4 (S.D. Tex. Dec. 7, 2009).  In that situation, "[a] delay of two months after the filing of the original complaint or almost thirty days after the notice of removal has been found dilatory." *Id.*; *See Irigoyen v.*

25

*State Farm Lloyds*, No. CA-C-03-324-H, 2004 WL 398553, at *4 (S.D. Tex. Jan. 5, 2004).

Other courts, however, have concluded that a plaintiff was not dilatory in seeking leave to amend within the same time frame. *See Schindler*, 2005 WL 1155862, at *4 (holding that the plaintiff was not dilatory when she filed the motion to amend a month and a half after she filed her state court petition and less than thirty days after removal to federal court); *Johnson v. Sepulveda Props., Inc.*, No. A.99-2312, 1999 WL 728746, at *3 (E.D. La. Sept. 16, 1999) (holding that amendment sought two months after state court petition filed is not dilatory); *Holcomb v. Brience, Inc.*, No. 3:01-CV-1715-M, 2001 WL 1480756, at *2 (N.D. Tex. Nov. 20, 2001) (amendment two months and one week after state court filing and one month and one week after removal held not dilatory). *See also McNeel v. Kemper Cas. Ins. Co.*, No. A.3:04-CV-0734, 2004 WL 1635757, at *3 (N.D. Tex. Jul. 21, 2004) (holding that amendment submitted five months after filing of state court petition and six weeks after removal is not dilatory); *Vincent v. East Haven Ltd. P'ship*, No. A.02-2904, 2002 WL 31654955, at *3 (E.D. La. Nov. 20, 2002) (concluding that amendment submitted five months after state court filing and six weeks after removal is not dilatory).

In this case, more than ten months have elapsed from the time Plaintiffs filed their original petition in state court until Plaintiffs sought to file the instant motion

to amend.   Nevertheless, the Court has not issued either a scheduling order setting forth discovery deadlines or any pretrial or trial dates.   None of the Defendants have filed answers in this case, and discovery has yet to commence.  In addition, this case was stayed for several months, from April 13, 2016 until October 4, 2016 (Docs. 18 and 35), while the Court dealt exclusively with Plaintiffs' motion to remand.

Some significant activity has occurred  in the form of  Defendants' filing of a dispositive motion to dismiss which was fully briefed.  Plaintiffs counter that they only recently learned that CenturyLink owns a contaminated tract of the Facility and has conducted activities likely to exacerbate the migration of contaminants towards Plaintiffs' properties and the Chicot Aquifer.  (Doc. 45-1 at p. 14).  While more than ten months have passed from the time this case was commenced until the motion to amend was filed, the record reflects that Plaintiffs endeavored to file the motion shortly after receiving the RBB Expert Report prepared on November 4, 2016. Plaintiffs filing of their motion to amend, therefore, was not dilatory in that Plaintiffs: (1) recently discovered CenturyLink as a PRP; (2) quickly issued a LEQA notice to CenturyLink on November 7, 2016, in order to commence the 30-day LEQA notice period; and (3) filed their motion to amend shortly thereafter on December 19, 2016. Accordingly, the undersigned finds that the second *Hensgens* factor weighs in favor of Plaintiffs.

3.    *Will the Plaintiffs be significantly injured if amendment is not allowed?*

As for the third *Hensgens* factor, the Court must consider the degree to which Plaintiffs may be harmed if the amendment is not allowed.  Courts, therefore, must consider "whether the already named diverse defendant would be unable to satisfy a future judgment and whether the plaintiff could recover against the proposed nondiverse defendant." *Darr v. Amerisure Ins. Co.*, No. 16-232, 2016 WL 5110267, at *8 (M.D. La. Aug. 31, 2016).

Because Plaintiffs have asserted valid claims against CenturyLink, as discussed above, Plaintiffs are likely to be prejudiced if not allowed to amend their claim by adding a potentially responsible party to he case.  *See Darr*, 2016 WL 5110267, at *8.  Costs and judicial efficiency, as well as avoiding possibly inconsistent verdicts in two different forums, militate in favor of granting Plaintiffs' motion to amend.  *See Joseph v. Fluor Corp.*, 513 F. Supp. 2d 664, 670 (E.D. La. 2007) (explaining that "considerations of cost, judicial efficiency and possible inconsistency of results militate in favor of not requiring plaintiff[s] to prosecute two separate claims in two forums when both arise from the same set of facts and circumstances.").  Accordingly, the Court finds that the third *Hensgens* factor weighs in favor of allowing the amendment.

4.   *Are there any other factors bearing on the equities in the case at hand?*

The fourth *Hensgens* factor includes consideration of Defendants' right to litigate in the federal forum, which is not an insignificant consideration.  The Court must therefore balance the original defendant's interest in maintaining a federal forum with the competing interest in avoiding potentially parallel litigation.  *See Darr*, 2016 WL 5110267, at *8.  Because the claims against Defendants are based on state law, there is no reason to anticipate that the state court would not or could not make fair determinations on the matters at issue.  In balancing the equities in this case, and considering the procedural history of this case, the Court concludes that the prejudice to Plaintiffs associated with piecemeal litigation should the amendment be denied would be greater than the potential prejudice to Defendants should the amendment be permitted.  Accordingly, the Court finds that the fourth *Hensgens* factor weighs in favor of allowing the amendment.

### III.  Conclusion

Upon consideration of each *Hensgens* factor, the equities weigh in favor of allowing Plaintiffs to amend their complaint by adding CenturyLink and their claims against CenturyLink under LEQA as well as La. Civ. Code arts. 667-669 and 2315. Pursuant to Fed. R. Civ. 15(a), Plaintiffs should also be allowed to amend their complaint to add their LEQA claims against Union Pacific and Southern Pacific.

29

However, because the addition of CenturyLink destroys subject matter jurisdiction, this case is due to be remanded pursuant to § 1447(e).

Based on the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiffs' Motion for Leave to File Amended Complaint (Doc. 45) be **GRANTED**, that Plaintiff's proposed Second Supplemental and Amending Pleading (Doc. 45-3) be filed in this case, and that this cause be remanded to the 15th Judicial District Court, Parish of Lafayette, State of Louisiana, for lack of subject matter jurisdiction.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed .R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within FOURTEEN (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except

upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

**THUS DONE AND SIGNED** at Lafayette, Louisiana, this 8th day of March, 2017.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**